### UNITED STATES v. KRAFFT.

#### (Circuit Court of Appeals, Third Circuit. April 23, 1918.)

#### No. 2323.

1. WAR ⊂⊃4—ESPIONAGE ACT—INCITING INSUBORDINATION, ETC., IN MILITARY OR NAVAL FORCES.

   To constitute an offense under the provision of Act June 15, 1917, c. 30, tit. 1, § 3, 40 Stat. 219, that "whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty in the military or naval forces of the United States" shall be guilty of a crime, it is sufficient that the accused did the acts charged, and that they were done willfully and with intent to cause insubordination, disloyalty, mutiny, or refusal of duty in the military or naval forces, and it is not necessary to show that they produced the effect intended.

2. WAR ⊂⊃4—ESPIONAGE ACT—PROSECUTION FOR VIOLATION—TRIAL—INSTRUCTIONS.

   In a prosecution under Act June 15, 1917, c. 30, tit. 1, § 3, 40 Stat. 219, for willfully attempting to cause insubordination, disloyalty, mutiny, and refusal of duty in the military and naval service of the United States, the court *held* to have properly submitted the cause to the jury, under instructions which correctly construed the statute and stated the questions of fact for determination by the jury, and the verdict of the jury, finding the defendant guilty, *held* sustained by the evidence.

3. WAR ⊂⊃4—ESPIONAGE ACT—PROSECUTION FOR VIOLATION—EVIDENCE.

   On such trial, evidence of opinions expressed by defendant at some previous time and place was immaterial, and properly excluded.

In Error to the District Court of the United States for the District of New Jersey; J. Warren Davis, Judge.

Criminal prosecution by the United States against Frederick Krafft. Judgment of conviction, and defendant brings error. Affirmed.

Certiorari denied, 38 Sup. Ct. 582, 247 U. S. ——, 62 L. Ed. ——.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Morris Hillquit, of New York City, and H. P. Lindabury and Henry Carless, both of Newark, N. J., for plaintiff in error.

Charles F. Lynch, U. S. Atty., of Newark, N. J., and Andrew J. Steelman, Asst. U. S. Atty., of Jersey City, N. J.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below Frederick Krafft was charged with the violation of section 3 of the Act of June 15, 1917, which provides:

"Whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, * * * shall be punished by a fine of not more than $10,000, or imprisonment for not more than twenty years, or both."

The indictment contained four counts, the first of which charged defendant with "knowingly, willfully, and unlawfully attempting to cause insubordination in the military and naval forces of the United States, in that he, the said Frederick Krafft, did then and there speak to Martin T. Gunning, corporal in Company K, First New Jersey Infantry, who had been duly mustered into the military service of the United States, and Albert Barton, corporal in the First New Jersey Infantry, who had been duly mustered into the military service of the United States, and divers other persons who were members of the military forces of the United States, and did then and there say: 'I can't see how the government can compel troops to go to France.' 'If it was up to me, I'd tell them to go to hell.' 'It's a damn shame.' 'I can't see why the Socialists here have not the same rights as in Germany.' 'They send their own Senators down to Washington, and they will not let the people do it'—and divers other words and sentences which are to the grand jury unknown." The count concluded with the averment that this was done "with the intent of him, the said Frederick Krafft, to influence, persuade, and cause the said persons, who were members of the military forces of the United States, to become insubordinate, contrary to the form of the statute," etc. The second count averred Krafft had used the same words and in like hearing with intent "to influence, persuade, and cause the said persons, who were members of the military forces of the United States, to become disloyal to the United States," etc.; the third count charged him with intent "to influence, persuade, and cause the same the said persons, who were members of the military forces of the United States, to mutiny, to the injury of the military service of the United States"; and the fourth count with intent "to influence, persuade, and cause the said persons, who were members of the military forces of the United States, to refuse to do the duties imposed on them as such members of the military forces of the United States, to the injury of the United States," etc.

To this indictment the defendant pleaded not guilty. The jury heard the proofs, which consisted of five witnesses, all of whom were enlisted men, and who were present on the occasion when Krafft is al-

leged to have used the words charged, and who were called on behalf of the government, and also the testimony of the defendant and twelve other witnesses, whose testimony was to the effect that Krafft had not used the language specified in the indictment.

[1] At the conclusion of the testimony the defendant, who was represented by able counsel, asked the court to direct a verdict of acquittal on the ground, inter alia:

That "the facts or statements charged in the indictment do not show any intent to cause the thing charged; that is, insubordination, disloyalty, mutiny, or refusal of duty. That, while they may produce certain results, there is nothing in the words themselves that tends to produce that result, to the extent of charging intent, which is a necessary element in the charge. That there is no proof in this case that the defendant made these statements with the intent to do the things charged in the four counts of the indictment: that is. with intent to cause insubordination in the army, or with intent to cause disloyalty in the army, or with intent to cause mutiny in the army, or with intent to cause refusal of duty in the army. And I submit that, without intent being established by the affirmative case of the government, no conviction can lie."

As further ground to support such request for binding instructions of acquittal, the defendant contended:

"That the evidence cannot be complete until it is shown that these things are to the injury of the service of the United States, * * * and that there is no evidence showing that such injury has occurred to the service of the United States. Assuming that the words were said, there is no evidence that the words had any more effect than to cause a disturbance in the crowd."

This request the court denied, saying:

"As I view it, there are really two questions, both of which are jury questions. The first question is whether or not the defendant spoke the words which are alleged in the indictment and which he is charged with speaking. If he did not, that ends the case. The jury will determine whether he did that or not. Second, if he did, what was the intent in his own mind in speaking them? What effect did he intend that they should have upon those who listened, who were already in the service, or might possibly be called into the service; and it seems to me that, under the circumstances, that should be determined by the jury. Therefore, your motion will be denied, and an exception granted."

This holding, viz. that there were two questions of fact involved, first, were the words charged spoken? and, secondly, if spoken, what was Krafft's intention in speaking them? what effect did Krafft intend they should have on those hearing them? were afterwards embodied in the charge which is printed in full on the margin.[1]

[1] "The action which you have been called upon to try is an indictment found by a grand jury in this district against the defendant, Frederick Krafft, for the violation of an act of Congress approved June 15, 1917, which provides, among other things, that whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval service, is guilty of the crime which this statute denounces.

"It has been admitted that the United States is at war. There are two considerations which enter into every verdict—the law and the facts. The law is exclusively for the court; the jury have not any business with it, except as it is laid down by the court, and it is the duty of the jury to accept the law as the court defines it. The court alone is responsible for accurately

In thus confining the jury to the two issues specified above, the court in effect denied the contention of defendant's counsel that, to constitute the crime, the government was required to go further, and show, not only that the words were used with the intent to effect insubordination, disloyalty, mutiny, or refusal of duty, but that they ac-

expounding the law to you. The facts are exclusively for the jury, and the jury are to find what the facts were from the evidence, and then determine whether or not, under the testimony and the law as laid down by the court, the defendant is guilty or not guilty. 'Insubordination' is defined by the Standard Dictionary, one of the best authorities, as being 'the state of being insubordinate; disobedience to constituted authority'—which under this statute, is the military or naval authority. 'Disloyalty' is defined by the same authority to be 'the state of being disloyal; unfaithful to one's government'—and in this case it would be disloyalty or unfaithfulness to the constituted military or naval authorities. 'Mutiny' means 'to rise against lawful or constituted authority, particularly in the naval or military service.' 'Refusal of duty' is 'to reject or refuse to perform the duties imposed by the military or naval authorities.' Now, the question for you gentlemen to determine is whether or not the defendant caused or attempted to cause insubordination, disloyalty, mutiny, or refusal of duty, as I have defined those words to you. In your consideration of the facts, and in reaching your verdict, I charge you that the defendant is presumed to be innocent until proved to be guilty beyond a reasonable doubt. A reasonable doubt means a doubt that is founded in reason and arises from the evidence. So, gentlemen of the jury, you are limited to the evidence in your consideration of this case, and your verdict should be founded upon nothing else than that—not upon prejudice, sympathy, or any outside, extraneous matter. Your finding of the facts should be determined by what you have heard in this courtroom from sworn witnesses whom you have seen. You have listened to them; you have watched them, both for the government and for the defense; and it is within your province to pass upon the credibility of those witnesses, whether you are going to believe this one or the other one—whether this one was deliberately misrepresenting or the other one, or whether this one or that one is mistaken. You are to pass upon their credibility, and upon the weight which you are going to give to their testimony, and find your verdict, not upon their names, not upon their politics, nor upon their creed, but upon the evidence which was presented before you. Politics here and there crept in; but, gentlemen of the jury, it has no place in your consideration. You are to shut your eyes to every last thing except the testimony which was presented before you, and in deliberating upon that use your common sense and all the brains that God has given you, without prejudice, without partiality, and mete out to this defendant what law and justice require.

"An indictment is a charge against a person. The government contends that the defendant violated this statute in causing or attempting to cause insubordination. That you will find in the first count. By 'count' I mean a separate charge. A bill of indictment is based on one or more charges, which charge that the defendant violated the law in this particular or in the other particular, and the separate charges are what are called counts. The first count charges as I have stated to you. The second count charges, in substance, that the defendant violated this statute in causing or attempting to cause disloyalty in the military or naval forces of the United States. The third count is that he caused or attempted to cause mutiny in the military or naval forces, to the injury of the government; and the fourth count is that he caused or attempted to cause refusal of duty in the military or naval forces of the United States, to the injury of the same. If he did that, gentlemen of the jury, he is guilty. If he did not do it, he is not guilty. It is for you to determine whether or not he did. In your deliberations there will be two questions which you will have to decide. The government charges that he violated the statute in the ways in which it is charged in the indictment by

tually did produce that effect, and injured the United States service. Did the court commit error in so holding? Was it necessary for the government, not only to show the defendant used the words, not only that he used them with intent to cause insubordination, but that his counsel and purpose actually caused mutiny, insubordination, disloy-

the utterance of these words at the time and place which has been testified before you: 'I cannot see how the government can compel troops to go to France. If it was up to me, I would tell them to go to hell. It is a damned shame. I cannot see why Socialists here have not the same rights as in Germany. They send their own Senators down to Washington to vote on conscription, and they will not let the people do it.'

"The first question, gentlemen of the jury, which you will have to determine, is whether or not the defendant said these words. If he did not, that ends the case, and your verdict should be not guilty. If you should reach the conclusion that he did say those words, then a further question arises, and that is: What did the defendant intend by the use of those words? As a matter of law, it would not be sufficient for him to say those words, without intending willfully to cause insubordination, disloyalty, mutiny, or refusal of duty, or some of them, in order to constitute guilt. In order to hold the defendant guilty, he must have said those words with the intention of accomplishing some one of those things. Now, that might be accomplished by speaking directly to soldiers who were in the military forces of the United States. It might be accomplished by speaking to a crowd partly composed of those who were subject to draft and might be called thereafter. It is for you, from all the facts which have been testified to, to determine, first, whether or not the defendant used the words which he is alleged and charged to have used. If you find that he did, then it is for you to determine with what intention he used those words, because, if he did not use those words willfully and intentionally to cause or to attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, as I have defined them to you, he is not guilty; but, if he did, then he is guilty.

"I have tried to make the law governing the case plain to you gentlemen. The court has no idea as to the facts. If he had, he would not tell you; that is your business. You will therefore retire and bring in your verdict.

"I have several requests here from the defendant. The first request I think I have covered: the second I have covered; the third, fourth, and fifth I have covered. In fact, I think I have covered all of them, except the last one. Is that right, Mr. Lindabury?

"Mr. Lindabury: Yes.

"The Court: Then, as I understand it, they are all withdrawn, except the last one, as having been substantially covered in my charge.

"Mr. Lindabury: Yes, your honor.

"The Court: Gentlemen, the last request is: 'If the jury finds that the defendant made the statements alleged in the indictment, and that the statements were made as the result of sudden anger and without deliberation, the defendant must be acquitted.' I so charge you. As I understand this point, it is directed to this phase of the law: That the defendant cannot be convicted unless he did what he did with intention. When he said those words—if he said them—if he intended willfully to cause one of those things which the statute denounces, then he is guilty; if he did not, he is not guilty.

"It is important, gentlemen of the jury, that nothing should interfere with the military and naval forces of the United States, when it is at war and in a death struggle. It is just as important, gentlemen of the jury, that at this time and all other times the liberty of individual citizens who have not committed crime be protected. So, in your deliberation, you will consider the fact, and the fact alone, as to whether this defendant made these statements, and, if he did, did he make them with intention willfully to cause insubordination, disloyalty, mutiny, or refusal of duty? But, gentlemen, the importance of noninterference, as I said a while ago, with the military and naval forces

alty, or refusal to obey orders? We cannot accept this view. Indeed, the clear statement of the defendant's proposition is its best refutation, for if that position be sound the defendant's guilt would be determined, not by what he did in the way of counseling disloyalty, but in what his hearers did in the way of following his directions. In other words, the defendant could do all in his power to bring about disloyalty, but as long as he did not succeed he committed no crime; but, if his counsel induced action, and that action resulted in insubordination or mutiny, then what the defendant did by way of counsel was later made a crime by the person who followed his counsel. Manifestly, Congress had no such purpose in view, nor can the simple and plain words of the act be given such meaning. In that regard the statute does not specify the writings, speech, or indeed the kind of means to be used; it makes one comprehensive, inclusive crime—"whoever, when the United States is at war shall cause." That means actually cause, succeed in causing; that is one crime the statute specifies, and also whoever shall willfully "attempt to cause" is put on the same status.

Both "willfully causing" and "willfully attempting to cause" are by the statute made alike criminal; and, such being the case, the attempt to cause being forbidden, as well as the causing, there is no ground to construe or apply this statute on the theory that insubordination, mutiny, or disloyalty must be effected. To so hold would be to defeat the whole purpose of the statute. For the purpose of the statute as a whole was not to wait and see if the seed of insubordination—in this case, sown in August in Newark; at a later date, in some camp—sprang into life and brought forth fruit, but it was to prevent the seed

when the United States is at war, should not influence you in the least to find a verdict that is not based absolutely upon the evidence, by the ordinary rules of logic and common sense; in other words, it should not make you convict a man more quickly than you would do in other times or under other circumstances. Your sole duty consists in finding just what the facts are, and, the fact that we are at war only bears on that as giving rise to this statute. So, shut out everything but the evidence, as I have charged you, every influence of every kind, and use your common sense and the ordinary rules of logic, and weigh the testimony of all of these witnesses, both pro and con, as they have related what occurred that night at that place, and determine whether the defendant used those words, and, if he did, what his intention was—whether he used them willfully, with intent to cause insubordination, disloyalty, mutiny, or refusal of duty.

"Mr. Lindabury: Your honor said that it is important that the conduct of the war be not interfered with in any way. I feel that that leaves the impression that any interference is a violation of this statute, and I would like to have an exception to that part of your honor's charge.

"The Court: Do you want me to change that, or charge it over in any way?

"Mr. Lindabury: The point being that any interference is not a violation of law. It is only the things that are prohibited by the statute that the jury should consider as interference.

"The Court: Gentlemen of the jury, Mr. Lindabury has called my attention to the fact that I stated that it was important that the naval and military forces of the United States should not be interfered with in the discharge of their duty, or words to that effect. We have in this case nothing to do with that at all, unless it comes within the provisions of this statute—only that the defendant did or said something willfully and with intent to cause insubordination, disloyalty, mutiny, or refusal of duty."

from being sown initially. Moreover, it is clear that this new statute was to enable the civil courts to prevent the sowing of the seeds of disloyalty, for with the fruits of disloyalty, to which a misguided soldier might be led by the disloyal advice, the military court-martial already provided was sufficient. The statute was not addressed to the misguided man who was in the service, but was manifestly to include any one—for "whoever" is a broad inclusive word—who in any way willfully created or attempted to cause insubordination. Clearly the court below was right in holding that if in fact the defendant used the language alleged, and if his purpose was willful to cause insubordination, then the statute was violated. Clearly it was right in holding that, to constitute the crime at the start, it was not necessary for that willful purpose to succeed.

[2] Turning to the charge of the court, we note, first, that in pursuance of its duty to expound the law the court quoted the statute in full, and then explained to the jury, in words to which no exception can be taken, what constituted insubordination, disloyalty, mutiny, and refusal of duty, respectively, viz.:

"'Insubordination' is defined by the Standard Dictionary, one of the best authorities, as being 'the state of being insubordinate; disobedience to constituted authority'—which, under this statute, is the military or naval authority. 'Disloyalty' is defined by the same authority to be 'the state of being disloyal; unfaithfulness to one's government'—and in this case it would be disloyalty or unfaithfulness to the constituted military or naval authorities. 'Mutiny' means 'to rise against lawful or constituted authority, particularly in the naval or military service.' 'Refusal of duty' is 'to reject or refuse to perform the duties imposed by the military or naval authorities.'"

The jury were then instructed that the question for it to determine was "whether or not the defendant caused or attempted to cause insubordination, disloyalty, mutiny, or refusal of duty, as I have defined those words to you." The charge called the jury's attention to the presumption of innocence of the defendant, to their duty to give him the benefit of all reasonable doubt, and that their verdict should be founded wholly on the testimony of witnesses before them, and should not be based on prejudice, sympathy, or any extraneous matter. The jury were then instructed that the first question for them was to determine whether the defendant had used the alleged words, and, if they found he did not, that ended the case. If they found he did, then they were to take up the further question of Krafft's intent in using those words; the court in that regard saying:

"If you should reach the conclusion that he did say those words, then a further question arises, and that is: What did the defendant intend by the use of those words? As a matter of law, it would not be sufficient for him to say those words, without intending willfully to cause insubordination, disloyalty, mutiny, or refusal of duty, or some of them, in order to constitute guilt. In order to hold the defendant guilty, he must have said those words with the intention of accomplishing some one of those things. Now, that might be accomplished by speaking directly to soldiers who were in the military forces of the United States. It might be accomplished by speaking to a crowd partly composed of those who were subject to draft and might be called thereafter. It is for you, from all the facts which have been testified to, to determine,

first, whether or not the defendant used the words which he is alleged and charged to have used. If you find that he did, then it is for you to determine with what intention he used those words, because, if he did not use these words willfully and intentionally, to cause or to attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, he is not guilty; but, if he did, then he is guilty."

The court further charged that:

"If the jury finds that the defendant made the statements alleged in the indictment, and that the statements were made as the result of sudden anger and without deliberation, the defendant must be acquitted."

We have thus quoted from the charge at length, to show that the law was properly construed by the court, and the questions of fact were clearly and properly defined, and their determination left to the jury. The jury having found the words charged were used, and that Krafft used them with the willful intent charged, we are bound to accept this verdict and these findings as conclusive, if there was any evidence from which a jury could reasonably draw the findings it has made. Humes v. United States, 170 U. S. 210, 18 Sup. Ct. 602, 42 L. Ed. 1011.

This court has only appellate jurisdiction, and, no matter what our opinion of the facts may be, we cannot, as the court below could have, grant a new trial; but our province is to examine the evidence, and ascertain if there was evidence to submit to the jury, or, to put it in another way, whether it was the court's duty to withdraw the case from the jury and direct the defendant's acquittal. With that in view, the judges of this court have severally examined and collectively discussed all the evidence, and we agree that the court below was bound, under the proofs, to submit the case to the jury. As the record comes before us, while we find much testimony given by the defendant and the large number of witnesses called by him, which testimony, if believed, would have warranted the jury in finding the defendant had never used the words alleged, we also find the testimony of some witnesses, much fewer in number, but whose testimony, if believed, warranted the jury in finding the words alleged were spoken by the defendant. It is neither our province nor purpose to discuss that testimony. That is wholly for the jury, who saw and heard the witnesses, and they were the tribunal of the defendant's fellow citizens the law made judges of the truth of the testimony for and against the defendant. Our duty is to see whether the government produced any such material testimony against him that it had to be submitted to the jury.

Referring, first, to the proof that Krafft had used the words alleged and specified in the indictment: The record shows, if believed, such proof was given by two noncommissioned officers—Gunning and Barton. These two men were together, and had the same opportunity of seeing and hearing. Gunning's testimony was:

"I do not see why the government can compel troops to cross the ocean. It is not in the Constitution. It is a damned shame. Why the hell should we do it? Why have not the Socialists of America the same right as they have in Germany, to vote for or against the war? They send their own Senators to vote for conscription. Why don't the people have a chance?"

Barton's testimony was:

"When I first saw him, I had come down from the Mandarin, Corporal Gunning and myself, and he stopped to light a cigarette, and then all of a sudden I heard somebody hollering, 'If it was up to me, I would tell them to go to hell.' I said to Corporal Gunning, 'There is something the matter over there;' and we started over, and we got in the center of the crowd, and when we got there he was saying: 'I cannot see how the government can compel troops to go to France. If it was up to me, I would tell them to go to hell. It is a damned shame. Why have not the Socialists of America the same privilege as they have in Germany?' He said: 'They have their own Senators down there vote for conscription, instead of having the people vote.' The crowd was interrupting him all the time. Q. You have said 'he' and 'him' a'l the time. Whom do you mean? Who was doing this talking? A. Mr. Krafft."

In view of this proof, it was the court's duty to submit to the jury whether they believed the testimony of these men, or that of the defendant that he had not used the words, or of his many witnesses to the effect that he had not used them, that they had not heard them, or that they were used by men in the crowd, and not by the defendant. The jury had all these witnesses before them; they could judge of the weight to be given to each severally, the opportunity they had to see, their manner on the stand, and all those elements which enabled the jury to fairly and justly determine whether the words charged were spoken that night by Krafft. The jury having found the words were used, this court must go further, and inquire: Was there any evidence, any facts, or whether there were any circumstances or surroundings, from which the jury could fairly infer they were willfully used by the defendant, with the willful intent of causing or attempting to cause insubordination in the military forces of the United States?

In that regard the proofs tended to show the defendant was a man of mature years, well educated, accustomed to public speaking, and his purpose was to persuade people to the beliefs he espoused. He was a man of much public prominence, had been a candidate for Governor of New Jersey, a man whose vocation as an editor turned his attention to public affairs, and whose purpose and paid or volunteered occupation was to educate and persuade his hearers to his beliefs. The proofs also show that he was speaking from an elevated platform, in a central place in a populous city, to a large crowd, and that in the crowd were from 30 to 50 men in uniform, who were plainly distinguishable. The United States was at war; the conscription act had been passed, which subjected the men selected to the orders of the military authorities of the country. Under such circumstances, a jury could reasonably infer that a man who undertakes to lead his hearers to adopt his spoken views must, in reason, be held to have intended his words should have, if followed, the effect in action which his counsel in words advised.

As we have seen, the court instructed the jury that, if the words were spoken in sudden anger or without deliberation, they should acquit. The verdict must therefore be taken as a finding that the alleged words were not uttered in sudden anger, but with deliberation. A man who has thus spoken with deliberation must be held to have intended the natural and probable consequences of his words; "for by thy words thou shalt be justified, and by thy words thou shalt be condemn-

ed." Considering, then, the time, the fact of the country being at war, the audience (composed of both soldiers and civilians) to whom. the words were addressed, the vehemence with which they were spoken, the duty of obedience which men in the service, or men liable to service, owed to the military authority, the impending conscription then in prospect, and the likelihood that all men in the service might be ordered overseas, can we say, as a matter of law, the language used at the time it was did not tend to cause, or was not an attempt to cause, insubordination? And, bearing on the relevance and significance of the time and circumstances words are spoken, we may repeat what was heretofore said:

"War is the dividing line. What was only foolish and unwise in word and deed last week, in peace, may be treason when war comes. Remember, when war comes, no man can serve two masters. As of old the message comes: 'Choose ye this day whom ye will serve.' " [2]

Clearly, then, this question of willful intent was one for the jury to determine, and by their verdict they have determined the willful purpose of the defendant was to cause insubordination. And in view of that finding, and under the law, we must accept the verdict of the defendant's twelve fellow citizens, which verdict in substance has found a matured and experienced public man advising younger and more impressionable men to insubordination in the military service. And we cannot close our eyes to the fact that such advice, if followed by these young men, might later subject them to court-martial and execution.

We have recited these facts at length, to show the defendant has had a court trial, a fair hearing, the aid of able counsel, and that the testimony of his witnesses has been heard and decided by a jury of his fellow citizens. Such being the case, there is no ground for this appellate court setting aside this verdict and the sentence imposed thereon, unless the court committed error in admitting or refusing to admit evidence. These latter assignments have had our thoughtful attention, but we find no error therein.

[3] The first was in the court's refusal to allow as evidence the testimony of a witness who had heard the defendant some time previously say he was in favor of the war with Germany. We fail to see how any expression of opinion on the part of the defendant at some other time and place was material to the present issue, which issue was: First, did the defendant use, on August 9, 1917, at Newark, the language alleged? and, second, if so, did he use it with the willful purpose to cause or attempt to cause insubordination? What he said or did at other times and places was not material to the issues on trial.

Another assignment referred to allowing the witness Gunning, in answer to the question, "How far could a person of ordinary sight recognize a soldier in that light, if standing upon a box of the height of the one on which the defendant was standing that night?" to testify, "With moderate sight he should recognize a soldier in uniform at a distance of 500 feet or more." The admission of such testimony must,

[2] Instructions given to applicants for naturalization in court at Philadelphia, April 6, 1917.

in the nature of things, be largely a question of judicial discretion, and unless we find an abuse of discretion, or that the defendant was prejudiced by such testimony, the cause should not be reversed. We are of opinion the court committed no error. This witness had already testified as follows:

"Q. And Market street to your knowledge is a sort of a great white way, well lighted up at night? A. Yes. Q. How is it lighted up at night? A. It is very bright. It is known as a white way. Q. Was it light enough for you to see uniforms in the audience around you? A. Yes, sir. Q. It was light enough for you to pick out so many uniforms around you? A. Yes. Q. How far away could you detect that a man was a soldier? A. I would know he was a soldier if he was 500 feet away. Q. In that light could you see a soldier's uniform 500 feet away? A. Yes. Q. Are you sure of that? A. Positive."

After this testimony the witness was then asked, "Could you tell that, if you were standing on the soap box that the defendant was standing on—could you see that far and detect the uniform?" and on objection being made the court itself suggested the question be put in the form in which it was allowed. Manifestly, this question, proper as we view it, lost any significance it had, when admitted, in view of the direction the proof on the part of the defendant took, for not only did the defendant, when he went on the stand, make no point of not being able to see the uniformed soldiers in the crowd, but the testimony given by some of his own witnesses was that the place was brightly illuminated.

Finding no error in the record to warrant reversal, the record must be remanded to the court below, and its judgment be affirmed.