## UNITED STATES v. BINDER.

(District Court, E. D. New York. June 22, 1918.)

WAR ☞4—OFFENSES—VIOLATION OF ESPIONAGE ACT.

The publication of a book challenging the sincerity of the aims of the United States in entering war, and of a nature calculated to arouse dissatisfaction and induce opposition to its continuance by falsely stating that this country entered war to save England from defeat and to aid munition manufacturers, etc., *held* to violate Espionage Act, § 3, denouncing the willful making of false statements with intent to interfere with military operations, to cause insubordination or to obstruct the recruiting or enlistment service.

Stephen Binder was indicted for violation of Espionage Act, § 3, for making false statements with intent to interfere with the operation or success of the military or naval forces, etc. On demurrer to the indictment. Demurrer overruled.

GARVIN, District Judge. The defendant has been indicted upon three counts, each of which charges him with violation of section 3 of the act of Congress which went into effect June 15, 1917, known as the Espionage Act. This section is as follows:

Whoever, when the United States is at war, shall wilfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies, and whoever, when the United States is at war, shall wilfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall wilfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United States, shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both. 40 Stat. 219, c. 30.

It is to be observed that three offenses are designated: (a) Willfully making or conveying false reports or false statements, with the intent specified; (b) willfully causing or attempting to cause insubordination, etc.; (c) willfully obstructing the recruiting or enlistment service, etc.

The first count charges the defendant with a violation of the second offense above set forth, and the second and third counts charge him with two separate violations of the first part of the section. The defendant has demurred to each of the counts of the indictment. The questions involved are whether or not the book entitled "Light and Truth" contains false statements which are of a character that

would naturally cause insubordination, disloyalty, mutiny, or refusal of duty in the military forces of the United States, and whether or not it contains statements, true or false, which would have such an effect.

It seems to me entirely unnecessary to discuss the matter at any great length. The first paragraph of the preface reads as follows:

At a time when freedom of speech is silenced, the right of free Americans to criticize their government abridged, and this country practically ruled by English lords, great capitalists, and a handful of autocrats, this book was written and published as a defiance to our government's misrule and as the bold assertion of the injustice of America's entrance into the world's war.

On page 11 appears this:

To call it a war for American rights would be convincing if we had not submitted before the German violations to the English violations of our rights. No, the cause was deeper; it was to help England—to save her and her allies from defeat under the pretext that we commence war for American rights. It was the response to the call for help across the sea, the urgent plea of Anglo-Saxon blood to Anglo-Saxon blood in the New World in the gravest hour of England's national peril. It was to bolster up the dwindling hopes of big American financiers who had great fortunes at stake in the war gamble on England's side.

On page 28 appears:

Now remains the third and last means to conquer Germany, namely, by force of arms. To gain a clean victory over the German nation as she is arrayed would, however, mean the desolation of Europe, which would exceed human imagination, while the bitter sorrows and mourning of beloved ones would visit thousands of American families. Death and its attendant miseries are lurking on the thresholds of American homes, whose boys are told to fight for liberty over 3,000 miles from their own country and to defend their heritage in another part of the world.

Beginning at page 160 appears:

Many prominent citizens of German ancestry have been strong advocates for conscription, they having been misled by the promises of war-ready press of the advantages which the country and the young men should derive from compulsory military service. Now, they understand to what consequences the adoption of militarism in the United States leads when, after the country has been turned into a military camp, the power of American manhood is not at all to be used for the defense of America, but to be sent 3,000 miles away to a struggle in Europe in which we have less interest or could have been less interested than Holland or the Scandinavian countries, which took a wiser road than we did, and it may consequently seem foolish how anybody could be led so far astray from real democracy as to advocate conscription for which there is less need in the United States than in any other place in the world.

Many American youths who will have to travel to the battle fields of France may ask themselves if, to defend their home and native land, it is necessary to make that long journey and to be ready to lay down their lives in attacking an enemy which never had any intention of attacking or invading the United States. The young soldiers of German extraction may have one more sting added to this, namely, the prospect of killing their own people, the annihilation of that flesh and blood from which they came. Their fathers at home may also ponder over this question and accuse themselves of being partly responsible for this by their indifference in the lawmaking of the United States. Perhaps they voted at election, but that was the furthest they went. They did not write to their Congressman or speak to him. They did not organize and instruct their fellow citizens to oppose laws which are a menace to the freedom of America.

When their boys were conscripted to fight their kinsmen across the seas, the German-American fathers knew that this was no war of self-defense, but they could not resist fate and cannot now resist the authority after their representatives having pulled their caps over their eyes and betrayed and sold them.

On page 256 appears:

That small group of Senators and Congressmen who opposed war is the best proof that the majority, in voting for the war, was carrying out the wishes of the munition makers, money aristocrats, and political autocrats. Some of them, the so-called larger majority of the conservatives, were in possession of war babies (stocks and bonds of war industries with their paying of dividends largely depending on the continuation of the war), others were related to munition and powder manufacturers or were themselves rich and had attained their office more by their money power than by intelligence, while the small group of more radically inclined representatives who opposed war were mostly poor men known for their leadership in Congress and Senate and their past records of defending the cause of the masses of the American people instead of selling them to the interests of big capital. Mr. Kitchin, the floor leader of Congress, declared in his celebrated speech before the votes were taken for or against this issue that before his God and his conscience he never could vote for war.

If those autocrats who always are ready to remind the people of our democracy had been willing to prove to the world the existence of the advanced American democratic spirit, they would have had the finest opportunity to leave the final say as to for or against war to a referendum of the American people, which they refused because they knew the majority could see the issue clear enough and would vote "no." Just as now free speech must be suppressed because truth is too dangerous to our present administration, so had the decision on the war of all the American people through a referendum to be suppressed because the money plutocrats and their political autocratic henchmen feared their attempt might be foiled at the last hour by the will of the people.

On page 267:

But we shall first have to abandon the deceiving phrase that it was a war for justice and right, and to establish firmly in the minds of the present and of the succeeding generations that it was waged, as stated in the first chapter, in order to save the financial structure of the money kings, to continue the blood profits of the munition traffickers, and to save our Anglo-Saxon overlords under whose spirtual ban our government has always been a partial supporter of England's cause throughout the Wilson régime.

By the unification during this war of the big business interests of America with the cause of the allies the American people are at present compelled to sacrifice blood and money in the world's war for the continuance and maintenance of the dictatorship of a combined clique of great financial captains of industry and their autocratic assisting politicians who are ruling the great people of the United States.

While these are some of the most extreme passages, the entire book is evidently intended to arouse dissatisfaction with the war and to induce readers to oppose its continuance. The authorities amply justify my conclusion that no such publication can be allowed, and the contention that the sentiments contained in it are mere expressions of opinion, which as such may be lawfully written and circulated, irrespective of the effect they may have in influencing our people to withdraw their support from the military and naval operations of the government at this critical time in the nation's history, cannot be sustained. United States v. Pierce et al. (U. S. D. C., N. D. of N. Y.) Department of Justice Bulletin No. 15, 245 Fed. 878,

888; United States v. Krafft (U. S. D. C., D. of N. J.) Department of Justice Bulletin No. 6 (for Circuit Court of Appeals opinion, see 249 Fed. 919, —— C. C. A. ——); Masses Publishing Co. v. Patten, 246 Fed. 24, 158 C. C. A. 250, L. R. A. 1918C, 79, Ann. Cas. 1918B, 999; United States v. Gneiser et al. (U. S. D. C., N. D. of W. Va.) Department of Justice Bulletin No. 71.

The demurrer is overruled.