**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Leonard OVERSTREET, Glen E. Garner, and Dominic L. Warren, Defendants–Appellants.**

**Nos. 96–2479, 96–2480 and 96–2567.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1996.

Decided Feb. 13, 1997.

Laura A. Przybylinski (argued), Office of the United States Attorney, Madison, WI, for Plaintiff-Appellee.

Tracey A. Wood, Alan Habermehl (argued), Stephen E. Mays, Kalal & Associates, Madison, WI, for Defendant-Appellant Leonard Overstreet.

Mark E. Colbert, Alan Habermehl (argued), Waunakee, WI, for Defendant-Appellant Glen Garner.

Alan G. Habermehl (argued), Reynolds, Thomas, Kelly & Habermehl, Madison, WI, for Defendant-Appellant Dominic L. Warren.

Before BAUER, WOOD, JR., and DIANE P. WOOD, Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.

"Remember," said Captain Courtney of the HMS Tigress, "As Mr. Bligh has said, 'Discipline must be preserved on a merchantman as well as on a man-of-war, and mutiny and piracy suppressed.'"

The government argues today that discipline in a federal penal institution also must be preserved, and mutiny suppressed.

Counsel for the defendants, however, express their opinion that "'mutiny' is a common English word, which in ordinary usage only conjures up an image of putting Captain Bligh into the longboat, pointing him toward England, and then setting sail for Tahiti." (Warren Br. at 10). While the common definition of mutiny "makes for great cinema," counsel contends, "it is of no particular assistance in trying to determine what conduct Congress intended to prohibit by 18 U.S.C. § 1792."[1] (*Id.*)

Determining the meaning of "mutiny" as used in 18 U.S.C. § 1792, a federal statute which penalizes mutiny in certain types of federal institutions, is now our task.[2] Few would disagree, except some inmates, that prison discipline must be maintained. The issue here is whether that can be done with this particular statute.

## FACTUAL BACKGROUND

The defendants-appellants, Overstreet, Garner, and Warren, were indicted in December, 1995, and charged in Count I with instigating and assisting in a mutiny at the Federal Correctional Institution, Oxford, Wisconsin, in violation of 18 U.S.C. §§ 1792, 2, and in Count II with wilfully injuring property of the United States in violation of 18 U.S.C. §§ 1361, 2. The defendants entered negotiated pleas of guilty to each count, reserving, however, the right to raise the issue of the vagueness of the mutiny statute and the insufficiency of the indict-

---

**1.** The section number of the statute almost corresponds with the date the HMS Bounty sailed from England in 1787, a voyage that gave rise to the classic Mutiny on the Bounty by Charles Nordhoff and James Norman originally copyrighted in 1932.

**2.** 18 U.S.C. § 1792 provides:

Whoever instigates, connives, willfully attempts to cause, assists, or conspires to cause any mutiny or riot, at any Federal penal, detention, or correctional facility, shall be imprisoned not more than ten years or fined under this title, or both.

18 U.S.C. § 1792 (1996).

ment as well as a sentencing issue. The defendants raised all of these matters by motions in the trial court, and the court denied them. Defendants have substantial prior offense records and are presently incarcerated at Oxford for cocaine violations.

The incidents involved in this case occurred on October 20, 1995 shortly after the Bureau of Prisons ordered the institution locked down. That order resulted from a major inmate disturbance at the federal correctional institution in Talladega, Alabama and from similar disturbances at other institutions around the country at about this time. Prison officials believed that these disturbances were related to Congress's decision not to amend the crack cocaine sentencing guidelines so as to make them less severe. Congress reached this decision on October 18, 1995, the day before the disturbances began.

The disturbance began at Oxford when one of the defendants, Garner, shouted obscenities at a guard. A confrontation ensued. The defendants made forceful anti-crack law statements; an object hit the officers' station window, shattering glass upon the officers; and defendants Warren and Overstreet using mop wringers broke six windows in the shower area and another window by the range door. Defendant Garner pulled apart a wooden table and used one of the legs to break a window in the television room along with a television set. Then, Garner swung the table leg threateningly over his head saying that the guards would have to kill him. A ranking guard entered the area and ordered the defendants to lay down whatever they were using as weapons and to return to their cells immediately. The response was verbal threats. Defendants aggressively refused to obey the guard's lawful order. Pepper spray changed their minds.

## DISCUSSION

■■■ The defendants first claim that, contrary to the holding of the district court, the mutiny statute is unconstitutionally vague. We review the district court's holding de novo. *United States v. Hayes,* 5 F.3d 292, 294 (7th Cir.1993).

As the statute contains no definition of mutiny, the defendants first turn to standard dictionaries. *The American Heritage Dictionary of the English Language,* 866 (1st ed.1973), defines mutiny as "open rebellion against constituted authority, especially rebellion of sailors or soldiers against superior officers." "Open rebellion" is then separately defined as "an uprising or organized opposition intended to change or overthrow an existing government or ruling authority." *Id.* at 1087. *Webster's Unabridged Dictionary,* 1087 (1st ed.1973), defines mutiny as "forcible resistance to or revolt against constituted authority on the part of subordinates, specifically an insurrection of soldiers or seamen against authority or their commanders, open resistance to officers or opposition to their authority." *Black's Law Dictionary,* 1172 (rev. 4th ed.1968), defines mutiny in criminal law to be an "insurrection of soldiers or seamen against the authority of their commanders; a sedition or revolt in the army or navy." Defendants fault the dictionary definitions as simply restating the ordinary usage of the word mutiny without adding any guidance as to how the word should be defined as used in the statute.

The "ordinary usage" of mutiny, however, is helpful even though the definitions do not attempt to illustrate the meaning of the word in all possible circumstances, including as applied in the statute. A common theme runs through the definitions. That theme is forcible and open resistance against legitimate authority on the part of those subject to that authority. Admittedly, the original usage of the word mutiny was in the naval or military service, but the common usage of the word long ago exceeded the original limited meaning. The general use of the word mutiny has now extended to other situations where there is open resistance jeopardizing constituted authority. It requires no unreasonable extension to apply this common usage meaning to a penal institution. The army, navy, and penal institutions, in different degrees and in different ways, all have constituted authority and a requirement of adherence to various rules and restrictions to maintain discipline necessarily to be enforced. There is no illogical or unreasonable barrier, notwithstanding the major difference in circumstances, between the discipline nec-

essary on board a ship or the discipline necessary in a penal institution to protect the governing authority.

In *United States v. Gossett*, 877 F.2d 901 (11th Cir.1989), the defendants were convicted of mutiny on a small vessel, but under 18 U.S.C. § 2193 which falls under chapter 107 devoted only to seamen and stowaways. Likewise, in *Hamilton v. United States*, 268 F. 15 (4th Cir.1920), and *Southern S.S. Co. v. NLRB*, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942), only shipboard mutinies are considered. The important distinction which emerges from these cases, though, is one which contrasts ordinary disobedience with concerted action against legitimate authority. It is the latter which constitutes mutiny. *See, e.g., Southern S.S. Co.*, 316 U.S. at 40–41, 62 S.Ct. at 891–892 (seamen committed mutiny because they conspired to and did deliberately and persistently defy direct commands to perform their duties in making ready for the departure from port).

 Defendants criticize *United States v. Bryson*, 423 F.2d 724, 725 (4th Cir.1970), for its definition of mutiny. *Bryson* defines mutiny as "inmates resisting the warden or his subordinate officers in the free and lawful exercise of their legal authority." That definition, defendants argue, would permit the government to prosecute as mutiny any violation by an inmate of a command or rule. We agree with the defendants that mutiny requires more than merely resisting the authorities or the mere violation of a rule. Some of the violations that *Bryson*'s definition might conceivably cover could be administratively dealt with routinely within the institution and without a prosecution. However, *Bryson* is a two-short-paragraph per curiam opinion and offers little guidance. Moreover, that case in its factual context involved an assault on a correctional officer and thus seems to involve conduct beyond the terms used in its own definition.

Indeed, *United States v. Bey*, 667 F.2d 7, 9–10 (5th Cir.1982), recognized these shortcomings of *Bryson*. The *Bey* court added that mutiny is the substantial and determined resistance to lawful authority and that mutiny does not embrace every disciplinary violation. *Id.*

Congress has considered mutiny separately in the military context. *E.g.*, 10 U.S.C §§ 892, 894 (1996). The Court of Military Appeals in *United States v. Woolbright*, 12 C.M.A. 450, 31 C.M.R. 36, 1961 WL 4518 (C.M.A.1961), drew a line between disobedience and mutinous conduct under the Uniform Code of Military Justice. Disobedience by soldiers not motivated by a common intent to override lawful military authority is disobedience, not mutiny. *Woolbright*, 12 C.M.A. at 452, 31 C.M.R. at 38; *see also, United States v. Brown*, 19 C.M.A. 591, 591–92, 42 C.M.R. 193, 193–94, 1970 WL 7041 (C.M.A.1970). *United States v. Krafft*, 249 F. 919, 925 (3d Cir.1918), was a prosecution under the Espionage Act for an attempt to cause a mutiny in the armed forces. The *Krafft* court defined mutiny as the rising against lawful or constituted authority, "particularly" in the naval or military service. *Id.*

The defendants complain that the existence of different definitions of mutiny in different contexts leaves an "ordinary person" without a way to determine what definition applies to the statute in question. We view that "ordinary person," however, as not being so perplexed by the common usage of the word mutiny as to not be able to understand the nature of the conduct the statute prohibits. The common theme in all of these definitions is open and aggressive resistance to lawful authority. The defendants' conduct in this case clearly falls within this common theme. The defendants knew their conduct was no mere violation of a penitentiary rule. Their conduct exceeded that when they purposely acted in concert, were destructive, threatening of authority, and refused to obey legitimate commands until prison guards used pepper spray. The defendants knew they would be in trouble. They appear to have been intentionally trying to cause trouble in resisting authority so as to be supportive of other troublemakers in other institutions who were also objecting to congressional nonaction about crack cocaine sentencing. The defendants no doubt expected to be disciplined, though not by a prosecutor. That the defendants did not anticipate being prosecuted, however, makes

**1358**

no difference. Within limits, the manner of discipline was in the discretion of the government. Here the overall threat to authority was more aggressive than a mere rule violation. Therefore, the government did not abuse its discretion in prosecuting the defendants under the federal mutiny statute.

If prosecutors, as defendants fear, try to apply this mutiny statute inappropriately to situations exceeding the modern common sense use of the word mutiny, then the courts can deal with that improper effort. However, such was not the case here, and we will not reasonably anticipate such an improper effort by federal prosecutors acting in accordance with their oaths of office and under the supervision of the U.S. Department of Justice.

Congress did not define the term in the statute likely because it believed that so common a term—no longer limited to Captain Bligh and the "Bounty"—does not need to be defined for an ordinary person. We agree.

 In *United States v. Jackson*, 935 F.2d 832, 838 (7th Cir.1991), Judge Flaum clearly enumerated how to evaluate a vagueness challenge. A statute is not unconstitutionally vague merely because Congress might have been more explicit in its language. *Id.* Rather, to withstand constitutional challenge, all that is required is "that a penal statute define the criminal offense with sufficient definiteness so that ordinary people can understand what conduct is prohibited and in a manner that does not recognize arbitrary and discriminatory enforcement." *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)). Moreover, courts are to make this vagueness determination "in light of the facts of the case at hand" on "an as-applied basis." *Id.* (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 1857–58, 100 L.Ed.2d 372 (1988)).

Applying that common sense ordinary person approach to the facts of this case leaves no room for a vagueness challenge. What is said, meant, and intended by the statute is clear, understandable, and sufficient for ordinary people to know what is prohibited.

 Since the statute is deemed adequate, it constitutes a sufficient charge as used in the indictment. Supplemented with the bill of particulars, the indictment leaves no doubt what the charge meant and what constituted the offending conduct. It was a mutiny. Therefore, prosecution of the defendants under this statute did not violate their constitutional rights. *United States v. Cruikshank*, 92 U.S. 542, 557–58, 23 L.Ed. 588 (1875).

Defendants raise other issues, including a sentencing objection. All are without merit. There was no double jeopardy.

Appointed counsel have rendered their clients the best possible professional services, but this case must be and is

AFFIRMED.