## SOUTHERN STEAMSHIP CO. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 320.  Argued February 9, 10, 1942.—Decided April 6, 1942.

*Mr. Joseph W. Henderson,* with whom *Messrs. Randolph W. Childs* and *George M. Brodhead, Jr.* were on the brief, for petitioner.

*Mr. Robert B. Watts,* with whom *Solicitor General Fahy* and *Messrs. Robert L. Stern, Ernest A. Gross,* and *Morris P. Glushien,* and *Miss Ruth Weyand* were on the brief, for the National Labor Relations Board; and *Mr.*

*William L. Standard* for the National Maritime Union, respondents.

*Messrs. John J. Burns, Francis S. Walker,* and *William G. Symmers* filed a brief on behalf of the American Merchant Marine Institute, Inc., as *amicus curiae,* urging reversal in part.

MR. JUSTICE BYRNES delivered the opinion of the Court.

Upon the petition of a union not a party to the present suit, the National Labor Relations Board ordered an election among petitioner's unlicensed employees to determine their collective bargaining representative. The elections were held on board seven of petitioner's vessels during October, 1937. In the case of the election on board the S. S. *City of Houston,* the labor organizations involved objected to the presence of any representative of the petitioner during the voting, and consequently none was admitted by the Board. No such objection was raised with respect to the subsequent balloting, and petitioner's representatives were present while the vote was taken on board the remaining six vessels. The National Maritime Union obtained a clear majority of all the votes cast. Because of the exclusion of its representative from the voting on the S. S. *City of Houston,* petitioner objected to the certification of the N. M. U. as the exclusive bargaining representative of the employees in the unit. On January 26, 1938, the Board rejected petitioner's contention, and issued a certification order. 4 N. L. R. B. 1140.

Six months later, on July 26, the N. M. U. filed charges against petitioner, which it amended on November 22. On November 23, the Board issued a complaint in which it accused petitioner of violations of §§ 8 (1), (3) and (5) of the National Labor Relations Act. U. S. C., Title 29, § 158 (1), (3), (5). The allegations of the complaint were that the N. M. U. had been certified in January as exclusive bargaining representative; that petitioner had con-

sistently refused since that time to bargain with the Union; that as a result of this refusal to bargain a strike had occurred, on July 18, aboard petitioner's S.S. *City of Fort Worth*, while docked at Houston, Texas; that upon the *City of Fort Worth's* return to Philadelphia, on July 25, five members of the crew [1] were discharged because of their membership and activity in the Union, and particularly because of their participation in the strike; and that as a result of these discharges other members [2] of the crew of the *Fort Worth* had gone on strike while the vessel was at home dock in Philadelphia. In its answer to this complaint, petitioner generally denied these allegations and chiefly contended: first, that it had been under no obligation to bargain with the N. M. U., because the Board's refusal to permit petitioner to be represented at the election aboard the S.S. *City of Houston* rendered the entire certification proceedings void; and second, that the discharge of the five members of the *City of Fort Worth* was not an unfair labor practice, because it was based upon their misconduct in striking, on July 18, while under Shipping Articles, away from home port, and on board ship.

After the usual proceedings, on April 22, 1940, the Board issued its findings of fact, conclusions of law, and order. 23 N. L. R. B. 26. Its findings, which must be set out in some detail, follow:

After the election and the certification of the N. M. U. in January, 1938, the Union made persistent efforts through its representatives to arrange a bargaining conference with officials of the petitioner. Every such attempt was frustrated by the latter, who refused even to answer the requests, until August. In that month, the Union was notified that petitioner would not undertake to bargain

---

[1] Warren, Tracey, Pfuhl, Smith and Ferguson.

[2] Crassavaz, Reeves, Lathan, Burns, Hughes, Neeley and Holt.

with it "until the validity of the Board's certification was settled by the Board and the courts."

On July 17, while the *City of Fort Worth* was docked at Houston, thirteen unlicensed members of the crew met in a union hall. They decided to strike the next day, to compel petitioner to recognize the Union and to issue to the Union's shore delegates the passes without which they could not board petitioner's vessels. At 8 o'clock the following morning, the strike began. One of the men, Tracey, failed to turn the steam "on deck" for use in loading the cargo. He was then asked by the first assistant engineer why he had failed to do so, and answered that a strike was on, explaining the strikers' demands. When the first assistant engineer turned on the steam himself, Tracey persuaded Braun, the fireman, to leave his post. And Ferguson, who came on duty just at that moment to replace Braun as fireman, also refused to tend the fires. The second assistant engineer then undertook to tend the fires himself, and Tracey, Ferguson and Braun went to the poop deck, where the rest of the strikers were sitting. The poop deck is the usual meeting place of the crew when not on duty.

From that time until evening the strikers sat quietly by, engaging in no violence and not interfering with the officers of the ship or the non-striking members of the crew, who proceeded with the loading of the cargo. The strikers did not "claim to hold the ship in defiance of the right of possession of the owner."[3] But when the captain

---

[3] The Board found that the strikers were at no time ordered to leave the ship. It is true that three of the officers testified that they had neither given nor heard any of the officers give such an order. But despite a great reluctance to overturn a finding on such a pure matter of fact, we cannot square it with the affirmative and uncontradicted testimony of Tracey, one of the strikers, that petitioner's agent in Houston boarded the ship at least four times during the day, at least once in the company of the Captain, ordered the strikers to leave the

ordered them to return to work, they refused. They continued to refuse after a deputy United States Shipping Commissioner came aboard and read to them that provision of their shipping articles in which they had promised "to be obedient to the lawful commands" of the master. Late in the afternoon, although he had not been authorized to do so, petitioner's attorney in Houston promised the Union's attorney in that city that he would meet with the latter during the following week to negotiate an agreement and that he would recommend to petitioner that passes be granted to shore delegates. As a result of this promise, the strike was ended at about 7 p. m. and the ship sailed on schedule at about 9 p. m.

The return voyage to Philadelphia was marked by no further difficulty. However, during the course of it the captain decided not to reship five of the strikers.[4] When the ship reached port on July 25 and the men signed off the shipping articles, these five were informed that they would not be reshipped. Most of them had been members of the *City of Fort Worth's* crew continuously for a considerable length of time.[5] It was the custom of petitioner to have the seamen sign new articles for the next voyage when signing off the old, but even when this was not done the men considered themselves employed for the next voyage unless notified to the contrary. Under these circumstances, the Board found that the five men in question had actually been discharged and that their employment had

ship within the next half hour, and announced that he was going to bring on a new crew (R. 140–141, 161–162).

[4] See note 1, *supra.*

[5] The Board's finding on this matter was that "Tracey had been employed continuously over a period of 16 months, Ferguson for a period of 1 year, Pfuhl over a period of 8 months, Warren over a period of 6 weeks, and Smith over a period of 18 months. Each round-trip voyage of the *City of Fort Worth* is scheduled to take about 25 days." (R. 27.)

not simply ended as of course when the shipping articles expired. Seven [6] of the other men who had engaged in the Houston strike immediately struck again in protest against the discharge of their fellows. On the basis of this evidence, the Board found that both the strike at Houston on July 18 and the strike at Philadelphia on July 25 were caused by petitioner's unfair labor practices. And it made a specific finding with respect to each of the five men that the discharge was based upon participation in the Houston strike. It concluded that petitioner had interfered with its employees' right to organize and bargain collectively, in violation of § 8 (1); that it had discriminated with regard to tenure of employment, in violation of § 8 (3); and that it had refused to bargain with the authorized representative of its employees, in violation of § 8 (5).

Consequently, it ordered petitioner to cease and desist: (a) from discouraging membership in the N. M. U., or any other labor organization, by discriminating in regard to employment; (b) from refusing to bargain collectively with the N. M. U.; and (c) from interfering with, restraining, or coercing its employees in any way in the exercise of their right to organize and bargain collectively. In addition, and "in order to effectuate the policies of the Act," the order included the following affirmative requirements: (a) that petitioner bargain with the N. M. U.; (b) that it reinstate with back pay the five men discharged; (c) that, upon application, it offer immediate reinstatement to the July 25th strikers; and (d) that it post notices of its intention to conform to this order.

Petitioner sought to have this order set aside by the Circuit Court of Appeals. The Circuit Court, however, sitting *en banc*, and with one judge dissenting, entered a decree enforcing the order with a single minor modifica-

---

[6] See note 2, *supra*.

tion.[7] 120 F. 2d 505. We granted certiorari because of the importance of the matters involved, and because of an asserted conflict with decisions of this Court and of other Circuit Courts of Appeals.

Petitioner's contentions in this Court are: (1) that the refusal by the Board to permit a company representative aboard the S. S. *City of Houston* during the voting vitiated the entire election and certification proceeding and absolved petitioner of any duty under the Act to bargain with the N. M. U.; (2) that the employment of the seamen involved automatically terminated when they signed off the shipping articles in Philadelphia, so that they cannot be said to have been "discharged"; and (3) that participation in the Houston strike by the discharged seamen was misconduct of such a character that the Board cannot order their reinstatement.

The first two of these arguments are without substance. The Board enjoys a wide discretion in determining the procedure necessary to insure the fair and free choice of bargaining representatives by employees. *Labor Board* v. *Waterman Steamship Corp.*, 309 U. S. 206, 226; *Labor Board* v. *Falk Corporation*, 308 U. S. 453, 458. It is wholly reasonable to remove any possibility of intimidation by conducting the election in the absence of the employer's representatives. With respect to whether the five men in question were actually discharged upon the ship's return to Philadelphia, petitioner concedes that the formal signing off of the shipping articles was not conclusive. The tenure of their employment must be determined in the

---

[7] The Board's order permitted petitioner to deduct from the back pay due any amounts that the discharged men might have earned during the period in question, but required it to reimburse any public work relief agency for sums paid to any of the men during that time. The latter phase of the order was eliminated by the Circuit Court of Appeals on the authority of *Republic Steel Corp.* v. *Labor Board*, 311 U. S. 7. The Board raises no objection to this modification of its order.

light of all the evidence concerning petitioner's employment customs and practices. *Labor Board* v. *Waterman Steamship Corp.*, 309 U. S. 206, 218. The argument here therefore comes to this, that this record does not warrant a finding that the tenure of employment survived the termination of the shipping articles. An examination of the record convinces us that the concurrent finding of the Board and the Circuit Court on this question should not be disturbed.

The situation, then, is one in which an employer indulges in an unfair labor practice, a strike results, and several men are discharged for participating in the strike. If there were no more to the case, and the Board found that it would serve to effectuate the policies of the Act to reinstate the strikers, an order requiring reinstatement would undoubtedly be enforceable. *Labor Board* v. *Stackpole Carbon Co.*, 105 F. 2d 167. But there is more to this case. The strike was conducted by seamen on board a vessel and away from home port. The question is whether this circumstance renders it an abuse of discretion for the Board to order the reinstatement of the strikers. We think that it does.

Ever since men have gone to sea, the relationship of master to seaman has been entirely different from that of employer to employee on land. The lives of passengers and crew, as well as the safety of ship and cargo, are entrusted to the master's care. Every one and every thing depend on him. He must command and the crew must obey. Authority cannot be divided. These are actualities which the law has always recognized. On the one hand, it has imposed numerous prohibitions against conduct by seamen which destroys or impairs this authority. We shall consider in a moment the nature and scope of the criminal sanctions imposed in case of revolt and mutiny. But it is worth noting here that the form of the "shipping articles," which the master

and every member of the crew must sign prior to the voyage, has been carefully prescribed by Congress, and that these articles contain this promise: "And the said crew agree . . . to be obedient to the lawful commands of the said master . . . and their superior officers in everything relating to the vessel, and the stores and cargo thereof, whether on board, in boats, or on shore . . ." U. S. C., Title 46 §§ 564, 713. On the other hand, workers at sea have been the beneficiaries of extraordinary legislative solicitude, undoubtedly prompted by the limits upon their ability to help themselves. The statutes of the United States contain elaborate requirements with respect to such matters as their medicines, clothing, heat, hours and watches, wages, and return transportation to this country if destitute abroad. U. S. C., Title 46, §§ 651–692, 1131. It is in this setting of fact and law that we must test the validity of the Board's order of reinstatement.

Petitioner contends that the strike aboard the *City of Fort Worth* at the dock in Houston was mutiny and violated §§ 292 and 293 of the Criminal Code. Those sections provide:

§ 292. Inciting revolt or mutiny on shipboard. "Whoever, being of the crew of a vessel of the United States, on the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States, endeavors to make a revolt or mutiny on board such vessel, or combines, conspires, or confederates with any other person on board to make such revolt or mutiny, or solicits, incites, or stirs up any other of the crew to disobey or resist the lawful orders of the master or other officer of such vessel, or to refuse or neglect their proper duty on board thereof, or to betray their proper trust, or assembles with others in a tumultuous and mutinous manner, or makes a riot on board thereof, or unlawfully confines the master or other commanding officer thereof,

shall be fined not more than $1,000 or imprisoned not more than five years or both." U. S. C., Title 18, § 483.

§ 293. Revolt or mutiny on shipboard. "Whoever, being of the crew of a vessel of the United States, on the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States, unlawfully and with force, or by fraud, or intimidation, usurps the command of such vessel from the master or other lawful officer in command thereof, or deprives him of authority and command on board, or resists or prevents him in the free and lawful exercise thereof, or transfers such authority and command to another not lawfully entitled thereto, is guilty of a revolt and mutiny, and shall be fined not more than $2,000 and imprisoned not more than ten years." U. S. C., Title 18, § 484.

The Board's defense to this contention is two-fold. It argues, first, that the conduct of the strikers did not violate either of these sections; and, second, that, even if it did, the violation does not bar their reinstatement.

*First.* We think that the strike aboard the *City of Fort Worth* on July 18 was in violation of §§ 292 and 293. It may hardly be disputed that each of the strikers resisted the captain and other officers in the free and lawful exercise of their authority and command, within the meaning of § 293, or that they combined and conspired to that end, within the meaning of § 292. Deliberately and persistently they defied direct commands to perform their duties in making ready for the departure from port. It is true that they did not engage in violence or prevent the other men and officers from proceeding with preparations for the voyage.[8] But short of that, they did what they could

---

[8] It should be noted, however, that according to the second assistant engineer's testimony, when he told Tracey that he intended to put the steam on deck himself, Tracey replied, "You had better not. You will be sorry." No effort was made to carry out this threat.

to prevent the ship from sailing. In the words of the striker Tracey, had they not believed that their demands had been satisfied, "we would still be sitting there." There is no doubt that they undertook to impose their will upon the captain and officers.

None of these facts is denied by the respondents or by the Circuit Court.[9] Indeed it is admitted that, had the strike occurred on the high seas, the participants would have been guilty of mutiny. But a distinction is said to lie between strikes at sea and at dock To determine the validity of this distinction we turn first to the words of the statute. They are plain enough: "Whoever, being of the crew of a vessel of the United States, on the high seas, *or on any other waters within the admiralty and maritime jurisdiction of the United States*," etc. It has long been settled that the admiralty and maritime jurisdiction of the United States includes all navigable waters within the country. *The Genesee Chief*, 12 How. 443.[10] The water in the harbor of Houston is certainly navigable, and a boat at dock there is obviously within the territorial limits of the United States. The words of the statute alone, therefore, do not warrant an exception in the case of a vessel situated as the *City of Fort Worth* was when the strike occurred.

Nor are we referred to the decision of any court in which such an exception has been implied. Under the original Mutiny Act of 1790,[11] Justice Story held without hesitation that a refusal to work while a vessel was in an American harbor was a violation of the statute.[12] The Act of 1790

---

[9] The Board did not consider the question of whether the strike amounted to mutiny.

[10] On the jurisdiction of the United States over men and vessels in foreign waters, see *United States* v. *Flores*, 289 U. S. 137; *United States* v. *Roberts*, 27 Fed. Cas. No. 16,173 (C. C. S. D. N. Y. 1843.)

[11] 1 Stat. 112, §§ 8 and 12.

[12] *United States* v. *Hamilton*, 26 Fed. Cas. No. 15,291 (C. C. D. Mass. 1818) (the report of this case is not altogether clear on whether

42

was supplanted in 1835 by a statute which, with only minor changes, now appears as §§ 292 and 293 of the Criminal Code, set out above.[13]   Since 1835, whenever the question has arisen, the courts have held that a mutiny may occur in a harbor, either foreign or domestic, as well as at sea.[14] It is true, however, that in none of these cases does it expressly appear that the vessel was tied to a dock, as was the *City of Fort Worth* in this case.   And in the *Rees* case, the court specifically reserved the question of whether the Mutiny Act bars a strike on board a vessel so situated.   95 F. 2d 784, at 792.

It was therefore strictly accurate for the Circuit Court of Appeals to observe that "the question of the right of seamen to strike under the circumstances of the case before us is still an open one."   On this assumption, however, it proceeded to conclude that the necessity for absolute authority in the master is so considerably diminished when the ship is moored in a "safe" port that a strike in such circumstances should not be held to violate the Act.   This theory has been regarded with favor by a number of courts and

the ship was at anchor in Salem Bay or tied to a dock there, but the former seems to have been the case); *United States* v. *Gardner*, 25 Fed. Cas. No. 15,188 (C. C. D. Mass. 1829) (this report also fails to reveal the exact situation of the vessel in Boston harbor at the time of the strike, but it is possible that it was moored to the dock since Boston was its home port and it was "all ready for sea," and presumably the loading had just been completed).

[13] 4 Stat. 775, 776.

[14] *United States* v. *Cassedy*, 25 Fed. Cas. No. 14,745 (C. C. D. Mass. 1837); *United States* v. *Lynch*, 26 Fed. Cas. No. 15,648 (C. C. S. D. N. Y. 1843); *United States* v. *Roberts*, 27 Fed. Cas. No. 16,173 (C. C. S. D. N. Y. 1843); *United States* v. *Staly*, 27 Fed. Cas. No. 16,374 (C. C. D. R. I. 1846) (at anchor in the Providence River); *United States* v. Nye, 27 Fed. Cas. No. 15,906 (C. C. D. Mass. 1855); *Hamilton* v. *United States*, 268 F. 15; *Rees* v. *United States*, 95 F. 2d 784; *United States* v. *Albers*, 115 F. 2d 833.

commentators[15] and is said to conform more closely to changed conceptions with respect to the freedom of workers on land or sea to organize, to bargain, and to use economic weapons to enforce their demands.

The difficulty with the contention is that it ignores the plain Congressional mandate that a rebellion by seamen against their officers on board a vessel anywhere within the admiralty and maritime jurisdiction of the United States is to be punished as mutiny. If this mandate is to be changed, it must be changed by Congress, and not by the Courts. If further proof be needed of a Congressional belief that the requirements of discipline during a voyage do not vary with each change in circumstance, it may be found in the shipping articles to which we have already referred. For in those articles the members of the crew are obliged to promise to obey lawful commands "whether on board, in boats, or on shore." And before a seaman's certificate is issued by the Bureau of Marine Inspection and Navigation the applicant must take an oath to ". . . carry out the the lawful orders of my superior officers on shipboard."[16] The lower court expressed the opinion, "Upon reason, however, . . . there is no sound basis for depriving seamen of this right [to strike] when, as here, their vessel is moored to the dock in a safe domestic port." But the soundness or unsoundness of the reasoning is for the determination of Congress. As recently as 1939, two bills were introduced in the House of Representatives

---

[15] See *The Blake*, 1 W. Rob. 73, 166 Eng. Rep. 500; *Buddington* v. *Smith*, 13 Conn. 334; Sapiro and Frank, *Mutiny at the Dock*, 25 Cal. L. Rev. 41; Rothschild, *The Legal Implications of a Strike by Seamen*, 45 Yale L. J. 1181; Decision, 38 Col. L. Rev. 1294. But see McLaughlin, Note, 18 Ore. L. Rev. 128; Note, *Labor Disputes in the Merchant Marine*, 28 Va. L. Rev. 79.

[16] See current "Application for Seamen's Certificate," issued by Shipping Section, Bureau of Marine Inspection and Navigation, Department of Commerce. And see also U. S. C., Title 46, § 672 (g).

for the purpose of limiting the scope of §§ 292 and 293 to vessels "under way on the high seas." H. R. 3427, 3428, 76th Congress, 1st Session. The United States Maritime Commission communicated to the House Committee on Merchant Marine and Fisheries its firm objection to the measures,[17] and they were never enacted. When the legislative purpose is so plain, we cannot assume to do that which Congress has refused to do.

---

[17] Letter to the Committee dated March 27, 1939 and signed by the Chairman of the Commission, Emory S. Land:

"Under date of February 1, 1939, you requested the views and recommendations of the Commission with respect to H. R. 3427 and H. R. 3428.

.         .         .         .         .

"The proposed bills would emasculate the present laws in respect of revolt or mutiny on shipboard. No conduct by members of the crew of a vessel of the United States would constitute a violation of the statutes unless the vessel were under way on the high seas and then only if actual force as distinguished from the lesser degrees of revolt or mutiny involving use of fraud or intimidation were used against the commanding officer. Moreover, the proposed amendments would reduce the maximum penalties by seventy-five per cent.

"It is the Commission's considered opinion that there is no reason which would justify the Congress in lessening the authority of the masters on board vessels of the American merchant marine.

.         .         .         .         .

"The crimes of endeavoring to incite to revolt or mutiny, or actually accomplishing revolt or mutiny, may be committed 'on the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States'. It is well settled that this includes all such offenses committed on the vessels of the United States on navigable waters, including the ports, rivers and harbors of foreign countries. (*United States* v. *Flores*, 289 U. S. 137.)

.         .         .         .         .

"Seamen who sign articles to become members of the crew of a vessel of the United States enter into a relationship which, in the nature of things, is different from that assumed by persons employed on land. Both as 'wards of the admiralty' under the general maritime law and by special acts of Congress applying only to them, seamen enjoy many

In any event, a sweeping requirement of obedience throughout the course of a voyage is certainly not without

benefits not accorded to land workers. At the same time they must assume certain correlative duties not necessary to land occupations.

"In the Economic Survey of the American Merchant Marine, the Commission said (p. 46):

" 'The sea is no place for divided authority. When a man puts foot on the deck of a ship, he becomes part of a disciplined organism subject to the navigation laws of the United States.'

"It has been contended that the mutiny statutes do not apply unless the vessel is in actual danger and *a fortiori* there can be no mutiny in a safe harbor. This contention, not having met with success in the courts (*Rees* v. *United States*; *Hamilton* v. *United States*) is brought before the legislative branch of the Government in the form of the proposed amendments. The fact that a vessel may be in a safe harbor does not, under existing law, and it is submitted, should not, give sanction to the offenses covered by the mutiny statutes. It is apparent to all those familiar with the sea that no vessel is safe unless she is, among other things, manned by a competent crew which means, in short, a crew alert to its duties and responsive at all times to the lawful commands of the master. A crew which does not meet this test is not competent and must, moreover, be lacking in that morale which is necessary to the safe preservation of the ship, her passengers and cargo. Because of the human factor involved, it is difficult to see how the morale of a crew which feels that it should be free to disobey the lawful commands of the master when the vessel is not 'under way on the high seas', can be revived with automatic regularity when the ship weighs anchor or crosses an imaginary line to the high seas.

. . . . .

"Certainly there need be no fear, on the part of members of an orderly and competent crew, that they will run afoul of existing statutes governing discipline on board vessels of the United States. As there can be no escape from the necessities of such discipline, there should be no diminution of the authority required to meet those necessities.

"The Commission is of the opinion that the proposed amendments, if enacted, would be harmful to the development of the American merchant marine and it is, accordingly, opposed to the measures.

"The Commission is advised by the Acting Director of the Bureau of the Budget that there would be no objection to the submission of this report to your Committee."

--

basis in reason. The strategy of discipline is not simple. The maintenance of authority hinges upon a delicate complex of human factors, and Congress may very sensibly have concluded that a master whose orders are subject to the crew's veto in port cannot enforce them at sea. Moreover, it is by no means clear that a ship moored to a dock is "safe" if the crew refuses to tend it, as the strikers did at Houston. At the very least, steam must be maintained to provide light and fire protection.[18] The damage to the *Normandie* is grim enough proof that the hazard of fire is ever present.[19] It is not enough to say that, in the case before us, the strikers did not prevent these precautions from being taken; only the efforts of others averted the dangers to which they opened the door.

We conclude that the Circuit Court of Appeals erred in holding that the strike at Houston did not violate §§ 292 and 293.

*Second.* Assuming that the strike did violate these sections, the Board contends that the reinstatement provisions of its order were nevertheless valid. Section 10 (c) of the National Labor Relations Act permits the Board to require an employer who has committed an unfair labor practice to take "such affirmative action, including reinstatement of employees . . ., as will effectuate the policies of the Act." This authorization is of considerable breadth, and the courts may not lightly disturb the Board's choice of remedies. But it is also true that this discretion has its limits, and we have already begun to define them. *Labor Board* v. *Fansteel Metallurgical Corp.,* 306 U. S. 240; *Republic Steel Corp.* v. *Labor Board,* 311 U. S. 7. A complete definition of course was not and could not have been attempted in those cases.

---

[18] Memorandum to Ship Operators dated December 10, 1941, Bureau of Marine Inspection, Department of Commerce.

[19] N. Y. Times, Feb. 10, 1942, p. 1, col. 8.

Nor will it be attempted here. It is sufficient for this case to observe that the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task.

This was the kind of consideration for which the present case called. To bolster its claim that it responded to this call, the Board relies upon what it asserts to have been the "technical" nature of the violation of §§ 292 and 293. Specifically, it points to the comparative safety of the ship when moored to the dock, the absence of violence, and the double character of the ship as the strikers' place of employment and their home during the course of the voyage. While we have no doubt that the danger to the vessel was considerably less than it would have been had the strike occurred at sea, we have already indicated that it was certainly present and that considerations other than immediate danger to the ship require maintenance of discipline throughout the voyage. Likewise, the absence of violence was a fortunate feature of the affair, but the flouting of the captain's authority was nevertheless deliberate and complete. Finally, for these strikers to remain aboard the ship was indeed an act of very different significance than for strikers at an industrial plant to remain inside a factory. But in one respect at least the comparison is unfavorable to the strikers here. As a practical matter, the *City of Fort Worth* was definitely wrested from the control of its officers. In an industrial plant the employer is confronted only with the necessity of placing new men at the machines. But under the law petitioner was required

to furnish living quarters to any new crew whom it might have hired for the return voyage to Philadelphia. This meant the removal of the strikers from their quarters as well as their posts of duty. It is difficult to imagine that they would have surrendered their jobs and their quarters without a struggle. They asserted their right to occupy the quarters and to eat the food which the master was required to furnish them as members of the crew, and yet to refuse to work or to obey his orders. See *United States* v. *Albers*, 115 F. 2d 833, at 836. In fact, as we have noted, they intended, according to the witness Tracey, to "still be sitting there" if petitioner had not capitulated to their demands.

We cannot ignore the fact that the strike was unlawful from its very inception. It directly contravened the policy of Congress as expressed in §§ 292 and 293, and it was more than a "technical" violation of those provisions. Consequently, and despite the initial unfair labor practice which caused the strike, we hold that the reinstatement provisions of the order exceeded the Board's authority to make such requirements "as will effectuate the policies of the Act." [20]

It should be stressed that the view we have taken does not prevent the redress of grievances under the Act. At any time following the certification of the N. M. U. in January, 1938, the union and the Board could have secured the assistance of the courts in forcing petitioner to bargain. The importance of seeking such assistance promptly is strikingly illustrated in this case. [21] Had the union and the

---

[20] Cf. *Peninsular & Occidental S. S. Co.* v. *Labor Board*, 98 F. 2d 411, 414.

[21] We do not question the Board's finding that petitioner refused to bargain with the N. M. U. after January 26, 1938. But the findings and the record indicate that the union was not markedly diligent. The Board found that one request for a conference was made by a union representative at Houston "shortly after the certification." "In late

Board done so, the unfortunate occurrence at Houston might have been averted. And what is more, nothing that we have said would prevent the union from striking, picketing or resorting to any other means of self-help, so long as the time and place it chooses do not come within the express prohibition of Congress.

The case is remanded to the Circuit Court of Appeals with instructions to limit its decree of enforcement to those provisions of the Board's order requiring petitioner to bargain with the N. M. U. and to post notices to that effect, but to eliminate the other provisions of the order.

*Reversed.*

MR. JUSTICE REED, dissenting:

To support its judgment of reversal this Court relies upon the employees' violation of §§ 292 and 293 of the Criminal Code as justification for the Steamship Company's discharge of its seamen. If the seamen were discharged not for labor activity but because of the commission of serious crime, *Labor Board* v. *Fansteel Corp.,* 306 U. S. 240, would be authority for the Court's holding. It was there decided that § 2 (3) of the Labor Act did not preserve a striker's eligibility for reinstatement by the Board under § 10 (c), if the striker was discharged for reasons other than "union activity or agitation for collective bargaining," e. g., criminal acts. 306 U. S. at 255. The Court recognizes that where "an employer indulges in an unfair labor practice, a strike results, and several men are discharged for participating in the strike," and nothing more appears, the Labor Board may properly rein-

January or early February," the union's business agent in Philadelphia made a similar request. He renewed it "about the middle of February." "During the next month" he made two attempts to repeat his request by telephone. From that time until August 18, a month after the strike at Houston, he made only one other attempt, the date of which he was unable to fix.

50

state the strikers. It concludes, however, that where the strike provoked by the unfair practices is itself unlawful, the Board, regardless of the circumstances, loses its power to reinstate after discharge. This position, we think, unduly expands judicial review of the Board's discretionary power of reinstatement under § 10 (c) and is not supported by the *Fansteel* decision.

This Court recognized in the *Fansteel* case that the Board had discretion over reinstatement. 306 U. S. 258. It was thought that, however wide that discretion might be, "its limits were transcended" in that case. The ninety-five men in *Fansteel* were discharged "for the seizure and retention of the buildings." 306 U. S. 252. But those men held the buildings from February 17 until February 26. They disobeyed a court injunction order to surrender the factory, and successfully resisted by force the sheriff's efforts to enforce it. Only on his second attempt, with an increased number of deputies, did the sheriff accomplish their eviction and arrest. 306 U. S. 248–49.

Nothing approaching such disorder occurred here. The seamen's conduct did not affect the safety of the vessel. The only evidence of violation of the statutes is that the orders to load were ignored. We may assume, for this dissent, that this resulted in a violation of the criminal statutes. The Board found that the respondent refused to bargain collectively with the Union, that primarily this precipitated the strike, and that the respondent was not warranted in discharging any employee solely because of the strike. It further found that the strikers did not hold the ship in defiance of the owner nor did they trespass. The Board found in each instance that the discharges were not for disobeying orders but for striking, for peacefully, albeit unlawfully, resorting to self-help in retaliation against denial of their rights.[1] On the basis of

---

[1] "The evidence is plain that both Tracey and Ferguson were discharged because of the leading parts they played in the strike. Chief

these findings, supported by substantial evidence, the Board exercised its discretion to reinstate these men.

We think that, under these circumstances, it acted within its authority. We can see no justification for an iron rule that a discharge of a striker by his employer for some particular, unlawful conduct in furtherance of a strike is sufficient to bar his reinstatement as a matter of law. *Fansteel* teaches that there are extremes of conduct which leave no discretion to the Board. We think that the acts here fall on the other side of the line and that the Circuit Court of Appeals properly so determined.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY concur in this dissent.

---

Engineer Norton testified that he did not recommend Ferguson's discharge merely because he had disobeyed orders. 'I would have overlooked that had he taken the fires until we got straightened out.' Captain Rudan testified that he discharged both these men upon Norton's complaint that 'they had been on watch at the time of the commencement of this what I consider disobedience, and if they had gone on watch at the time, that the rest of the men probably would have followed. . . .'"

"Captain Rudan's testimony makes it abundantly clear that the motivating factor in the respondent's decision to discharge Pfuhl was his participation in the strike. . . .

"We entertain no doubt that an employee's intoxication provides ample reason for his discharge. We believe, however, that the respondent did not discharge Warren for this reason, but rather that it seized upon his drinking proclivities to rid itself of an active union officer. . . .

"On cross-examination Sherry admitted that Smith was discharged because of his participation in the strike. . . ."