UNITED STATES of America,
Plaintiff,

v.

SEAFARERS INTERNATIONAL UNION
OF NORTH AMERICA, PACIFIC DIS-
TRICT, etc., et al., Defendants.

No. 40642.

United States District Court
N. D. California, S. D.

April 18, 1962.

William H. Orrick, Jr., Asst. Atty.
Gen., Cecil F. Poole, U. S. Atty., for plain-
tiff.

John Paul Jennings, Pebble Beach,
Cal., for Seafarers International Union.

Stanley Neyhart and Duane B. Bee-
son, San Francisco, Cal., for Pacific
Coast Marine Firemen.

J. Paul St. Sure, Oakland, Cal., and
Richard Ernst, San Francisco, Cal., for
Pacific Maritime Assn.

HARRIS, Chief Judge.

Under the provisions of the Labor
Management Relations Act (29 U.S.C.A.
§ 178) the Court regularly made and en-
tered a restraining order in the above
entitled cause on the 11th of April, 1962.
Pending an application for the prelimi-
nary injunction the restraining order
was designed to preserve the status quo
and prevent the defendants from conduct-
ing and continuing a strike which had

resulted in a national emergency in the maritime industry.

The restraining order, although containing the usual provisions to be found in a Taft-Hartley injunction, met with immediate resistance on defendants' part and on April 13th the Court was advised that the seamen had refused to sign the articles in the traditional, statutory form unless a rider were affixed thereto in the following form:

"(b) The following provision shall be deemed a part of this agreement and shall be added as a rider to all Shipping Articles:

"It is agreed between the Master and the unlicensed crew that in the event the vessel is in a U. S. port and a bona fide strike or work stoppage occurs and the vessel is involved in such strike or work stoppage, either party to the collective bargaining agreement may terminate these Articles at such port by written notice to the other, in which event the unlicensed members of the crew shall be paid off by mutual consent. If the strike is called by a union which is not the collective bargaining representative of unlicensed crew members, the unlicensed crew members shall be paid transportation from such port to the port of engagement."

On April 13th during the course of the hearings concerned with the propriety and legal significance of the above mentioned rider, the Court regularly made and entered its findings of fact and conclusions of law and regularly made and entered a preliminary injunction herein. The far-reaching effects of the rider are at once apparent and the propriety of its use by the defendants must be considered in view of the scope, design and purposes of the injunctive relief.

The Pacific Maritime Association claims that its use will tend to frustrate and render meaningless the avowed purposes and design of the Act and they request a supplemental order clarifying this issue.

Similarly, the defendant unions also ask for supplemental orders and radical modifications of the preliminary injunction, as follows:

That defendant Pacific Maritime Association, and its member shipping companies affected by this preliminary injunction, and their agents, do not require crew members, during the period of this preliminary injunction, to sign Shipping articles which are binding upon them during the discharge of cargo in any American port at any time after eighty days following the issuance of the Temporary Restraining Order herein on April 11, 1962;

That defendant Pacific Maritime Association, and its member shipping companies affected by this preliminary injunction, and their agents, pay off their crews on mutual consent and discharge them under their Shipping Articles immediately upon entry in any American port after eighty days following issuance of the Temporary Restraining Order herein on April 11, 1962, and upon the making of their vessel safe and secure;

That defendant Pacific Maritime Association, and its member shipping companies affected by this preliminary injunction, and their agents, do not sail any vessel employing crew members represented by the defendant union from any American port upon a voyage in which more than one half such voyage, as determined from the date of departure from such American port to the scheduled date of arrival at any American port, is scheduled to occur after eighty days following the issuance of the Temporary Restraining Order herein on April 11, 1962.

These proposals, drastic as they are, should be considered and viewed in the light of the problems, economic, operational and otherwise, which confront the maritime industry when strike sanctions are exacted. Not only are the ships struck, but the cargo as well, awaiting to be transported and taken from the docks and delivered to the ultimate con-

signee. Pacific Maritime Association asserts that this is the first instance wherein cargo, as such, was subjected to strike sanctions, and represents a new approach to the strangulation process and slow economic death which inevitably occurs when picket lines are drawn over extended periods of time.

It is unnecessary to dilate upon the tragic situation confronting the State of Hawaii. The affidavit of Governor James Quinn received in evidence during the course of the hearings on the preliminary injunction in part, stated:

> That the State of Hawaii has been plagued with strikes and threats of strikes in the maritime industry causing immeasurable damage to its economy and imperiling the health and safety of its people time and time again. During the last ten months this State has suffered two shipping strikes. Before it could recover from the first it was plunged into the second. Losses in State revenues alone for this fiscal year due to the last strike amount to approximately $2,000,000.

> That if this strike is allowed to continue the shortages and exhaustion of food supplies and other essential commodities not only imperils the health and safety of the people of this State and its economy but also seriously affects the readiness of this State, which occupies a key position in the defense structure of the United States (20 percent of its population being military or military connected) to deal with the possibility of disaster, and emergencies resulting from enemy attack, sabotage or other hostile action to the detriment of the national health and safety. The health and safety of the State of Hawaii is vital to and part of the health and safety of the United States. When the health and safety of the State of Hawaii is imperiled so is the health and safety of the Nation.[1]

Similarly, the President of the United States of America, John F. Kennedy, in his communication to the Attorney General, stated:

> "In my opinion this unresolved labor dispute has resulted in a strike affecting a substantial part of the maritime industry, an industry engaged in trade, commerce, and transportation among the several States and with foreign nations, which strike, if permitted to continue, will imperil the national health and safety.[2]

Approximately 40,000 tons of vital cargo, including medical, remained undelivered and strikebound until this Court intervened. It was not until several weeks of lengthy hearings and extended negotiations that strikebound emergency cargo, including military, reefer and perishables was relieved in the so-called Liberty Gold Fruit Co. v. Weisberger, et al. (No. 28459) action, instituted by consignees.[3]

It is significant to note that all other cargo was held under strike sanctions. Comparable acute and demoralizing situations prevailed in other West Coast ports.

---

1. In 1948 a comparable situation prevailed as to the then Territory of Hawaii. See United States v. International Longshoremen's & Warehousemen's Union, D.C., 78 F.Supp. 710.

2. U.S.A. Exhibit No. (C).

3. The parties stipulated that the employees would remove from vessels perishables, freezer, cold storage, military cargo, mail and passenger baggage. In order to effectuate this stipulation the Unions removed the picket line, thus enabling their members and the longshore crews to load or unload vessels of the supplies authorized by the stipulation.

There is no reason that a similar arrangement cannot be entered into by the Unions in connection with the unloading of all cargo upon the completion of a voyage commenced during the preliminary injunction period and consummated after the 80-days have elapsed, thus permitting seamen to fulfill their duties under their articles without going through a picket line.

During the course of the said hearings affidavits were received from responsible shippers. That of Lester Goodman, President of the World Trade Association of San Francisco and Chairman of Getz Brothers & Co., representing one of the largest shippers in the United States, stated in his affidavit:

"Getz Brothers & Co., Inc., and in my opinion the other shippers, affected by the present labor dispute, will use American flag vessels to carry outbound and inbound cargo for possibly the first 60 days of the injunction, but after that cargo will be diverted, by necessity, to foreign flag and East Coast vessels in order to insure delivery and receipt and avoid the risk of having cargo tied up on the docks. The shippers, particularly the small ones, cannot afford to have cargo standing on the docks, such as they have experienced during the last few weeks.

"Unless the dispute is settled or some procedure can be worked out to insure delivery, and receipt, the shipper will have no choice but to avoid the use of the American flag vessels. This will result not only in a diversion of trade to the foreign flag vessels, but also a diversion of trade to foreign businesses. As an example, Getz Brothers is an agent for The Borden Company, and also Quaker Oats, both of which have plants abroad which can and will be used to supply the foreign market if American shipping is unreliable. Some of this business will come back to the United States, but not all of it.

"There will also be further injury to the Port of San Francisco and other West Coast Ports. Business will continue to be directed to the other ports on the East Coast and the Gulf where historically strikes occur less often and are of shorter duration."

The foregoing affidavit is typical of many that were marked in evidence disclosing a trend toward the use of foreign flag vessels in order to avoid the risk of having cargo tied up for extended periods at the docks and in the holds of vessels.

Also to be considered is the unusual character and far-flung activities of the industry. If the preliminary injunction is to preserve the status quo, then recognition must be given to sailing schedules, and the advance booking of cargo and passengers during the eighty day period. A series of affidavits was received by the Court from the members of the Pacific Maritime Association disclosing the internal and operational problems occasioned as a result of the strike.

Mr. Paul St. Sure, President of the Pacific Maritime Association, graphically described the situation confronting the industry:

"THE COURT: What is the total consist of the fleet? How many vessels?

"MR. ST. SURE: We have counted some 100 vessels. There are about 20 we haven't been able to account for, but I believe 130 vessels as an estimate will still hold, that fifty per cent will be either tied up or unable to take off by the time we reach the last week of the 80-day period, by reason of the scheduling problem and the inability to complete their voyage within the Taft-Hartley period of time. This, I submit to Your Honor, presents an unusual type of problem during which, or with which, you apply the intent of the statute with regard to resumption of status quo and at the same time permitting bargaining to continue in an atmosphere of status quo operation.

"If the ships are not to sail, this is one thing; if the men are not to strike, this is something else again; if the ships are to sail in part only and the men are to be in strike in part only, they have certainly a different kind of anomaly. But I submit to you that in the very area of the possibility of resuming bargaining under a status quo situation the picture of this industry will indicate that as of now we are beginning to be

on strike again, even though the Taft-Hartley Act has a full period of 80 days during which normal operations are presumed to be in effect.

"In other words, in the event that the ships are to be frustrated and their cargoes frustrated at the immediate end of an 80-day period, we will be fifty per cent on strike when about half of that period, or less, is past. I can assure you that this will not be conducive to endeavoring to bargain out a problem or settle during a period of status quo that doesn't exist. I can't stress too much the peculiar character of this problem because I think it does relate to the statutory authority which exists in Section 208–A of the Taft-Hartley Act, which indicates that the Court has the power to make such supplemental orders or such other orders as may be required under the circumstances, and although we have researched the law, I think rather diligently with regard to specific law on the subject, what we find seems to indicate this becomes the responsibility of the Court before whom the problem is presented. It is necessary to shape the law to meet situations which the statute merely generally indicates a desire to alleviate or correct." [4]

■ The Court, in the exercise of its equity jurisdiction, may formulate orders and decrees consistent with an orderly beginning and an orderly conclusion of all voyages conducted during the 80-day cooling off period.

4. Tr. p. 161, 1. 10 to and incl. p. 162, 1. 25.

5. Cf. Norris on the Law of Seamen (1951), Sec. 176, p. 187: Because of the peculiar nature of the seaman's calling, his obligation under the articles is to remain with the ship until the voyage is ended unless the contract be abrogated by mutual consent or by operation of law. This duty that the law imposes upon seamen is for the purpose of safeguarding maritime property, so that the mariners do not needlessly leave a valuable ship and cargo thus subjecting them to destruction or pilferage. Seamen, unlike shore

The specific provisions of the preliminary injunction provide in part:

That the defendants are restrained " * * * from in any manner interfering with or affecting the orderly resumption and continuance of work in said industry at the same rates of pay, hours of labor, and other terms and conditions of employment as were in effect immediately prior to March 16, 1962 * * *

" * * * to instruct immediately all their respective members to resume their normal employment, as the ships may be made ready for sailing * * * "

The foregoing language is sufficient and all-embracing. It contemplates that a seaman satisfy and discharge his contractual obligations under the articles without regard for the fact that the 80-day period might well expire before the completion of a given voyage.

The strategy and effect of the rider conceived and insisted upon by defendants would render nugatory the traditional obligations of the seaman provided for in the articles and would tend to create a selective or only a partial resumption of work.[5]

■ A national emergency having been found by the Court to exist, the Government is entitled to an injunction against the whole strike and the Court should not order a selective or partial resumption of work. United Steelworkers v. United States, 361 U.S. 39, 80 S.Ct. 1, 177, 4 L.Ed.2d 12, 169.

workers, cannot leave their vessel as a strike protest or in sympathy with a strike without subjecting themselves to serious difficulties. A strike at sea is mutiny and criminal prosecution may ensue.

"When a vessel comes into port while a strike is in progress, the members of the crew cannot strike and walk off the ship (unless they have been signed off) without incurring forfeiture of their earned wages and loss of their clothes and effects—the penalties of desertion. This rule is equally applicable to vessels in the coastwise trade."

In United States v. National Marine Engineers' Beneficial Association, 2 Cir., 294 F.2d 385 at 387, the Court views the significant language concerning the shipping industry:

"We could rest here, and on the convincing evidence supporting the finding that continuation of the strike 'would have a critical impact upon Hawaii, which occupies a key position in our defense structure, because Hawaii's supply of essential foods (taking into account the time required for transportation from the West Coast to Hawaii) would be exhausted * * *' but for appellants' contention that, assuming so much to have been established, the injunction should have been limited to strikebound tankers serving the East Coast and ships in the Hawaii trade. True, this contention reminds of that with respect to 'a selective reopening of some of the steel mills * * * to fulfill specific defense needs,' which the Supreme Court rejected in the Steelworkers case, 361 U.S. 39, 43, see also 49–54, 80 S.Ct. 1, 4, 180–182. However, the economics of merchant shipping may not be parallel with those of steel as regards the feasibility of segregating particular operations; and we prefer to rest affirmance upon another finding to which this contention is inapplicable."

Without the necessary assurances of returning to the port of ultimate destination and the discharge of the cargo after the 80 days, the injunction would provide merely a selective or partial resumption of work. Ships which could not complete their voyages within the 80 days would, for practical and realistic purposes, remain unproductive. Many would not sail at all—mindful that round-the-world voyages approximate 120 days in duration, outbound and inbound. Many would be forced to return on the last leg of the voyage without productive or any cargo for the reason that shippers would be reluctant to hazard the ultimate fate of struck cargo at the point of destination.

Obviously, shippers would not undertake cargo commitments under such dire circumstances.

Instead of creating a return to status quo, the injunction, if so interpreted as to its scope and legal effect, would create a catastrophic situation unsound economically, eminently unfair and unjust, and in complete conflict with the mandate of maritime law and the traditions of the sea.

It is significant at this juncture to note the attitude of the cargo shippers in the light of the strike sanctions. It is elemental that without cargo and passengers the owner-operators, if forced to sail the vessels under the mandate of the injunction, would merely provide the seamen with a pleasure jaunt. Such could not be the intent and purpose of the benign legislation that this Court is asked to interpret.

██ The Court, in shaping its decrees and orders, may consider the temper of the times and the environment in which the industry has been placed as the result of a long, enduring strike. The Court will take judicial notice of public sentiment and the reaction of the community through the medium of the press and other accredited sources. Appended to this memorandum may be found current press compilations depicting the critical condition of the maritime industry on the West Coast.

Counsel for the defendant unions finally recognized the necessity of balancing conveniences and in their memorandum filed with the Court observed:

" * * * The termination of the 80-day injunction in the present case cannot, as a practical matter, signal the immediate re-institution of a strike in the event that the dispute is not in the meantime settled. *The injunction continues to have a practical effectiveness so long as vessels which sail under its protection remain at sea.*" (Italics ours)

Union-Defendants then propose that vessels should not be permitted to sail on voyages in which more than a half of the scheduled trip-time occurs during the post injunction period. And continuing, the defendants conclude:

"An order of the proposed character is plainly authorized by the language of Section 208 of the Act which contemplates the issuance of 'such other orders as may be appropriate.' Indeed, accommodation of the competing policy considerations between the interests of the public, the employer and employees is the proper function of the District Court in issuing a preliminary injunction of this character."

In Brotherhood of Locomotive Engineers v. Mo. K. T. Ry., 363 U.S. 528, 529, 531–532–535, 80 S.Ct. 1326, 4 L.Ed.2d 1379, the court said:

"Conditions of this nature traditionally may be made the price of relief when the injunctive powers of the court are invoked and the conditions are necessary to do justice between the parties * * * The balancing of these competing claims of irreparable hardship is, however, the traditional function of the equity court."

■ In Textile Union v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 923, 1 L.Ed.2d 972, the United States Supreme Court held that the Federal Courts must fashion an appropriate rule of substantive law:

"Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. * * * It is not uncommon for federal courts to fashion federal law where federal rights are concerned."

Union-Defendants, in view of their proposed arbitrary formulae, would treat the interpretation to be placed upon the preliminary injunction in a vacuum, completely disassociated from the realities of the problems implicit in the contractual relationship which exists under the articles between the master and the seamen, and the owner-operators and the shippers and consignees. Their contention that upon the expiration of the eightieth day (estimated as June 29, 1962, if the strike issues are not earlier settled), the seamen are privileged to walk off the ship at the first American port leaving the cargo and ship to be strikebound for an indefinite period of time, is contrary to the traditions, customs and practices long held in reverence under elementary principles of maritime law.

Accordingly, the court will fashion a supplemental order herein which is to be affixed to the articles when executed by the seamen.[6]

The order will be filed contemporaneously with the within memorandum and will provide for the duration of the hiring and the express obligations imposed under the articles when executed, regarding the ultimate care and disposition of cargo upon the termination and completion of the voyages engaged in during the 80-day period, with reciprocal provision being made for pay-off by mutual consent.

The motion of the defendants to modify the injunction in the particulars hereinabove discussed, is DENIED.

This Court shall retain jurisdiction for the purpose of granting such other and

6. See United Steelworkers v. United States, supra, 361 U.S. at p. 59, 80 S.Ct. at p. 185, where it is stated: "Under the Labor Management Relations Act the District Court is given jurisdiction to enjoin 'and to make such other orders as may be appropriate.' Congress thus provided a jurisdiction additional to the power to grant an injunction, not alternative to it: and 'other order' may only supplement an injunction, it may not supplant it."
Cf. Southern Steamship Co. v. N. L. R. B., 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246.

further relief as may be necessary and proper under Section 208 of the Act.

### SUPPLEMENTARY ORDER

Application having been made for a supplementary order to be entered pursuant to Section 208(a) (ii) of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 178(a) (ii), it appearing that the order herein set forth is appropriate and necessary to effectuate the preliminary injunction entered in this cause on April 13, 1962, and good cause appearing therefor, IT IS HEREBY ORDERED:

1. That defendant Seafarers' International Union of North America, Pacific District, comprising Marine Firemen's Union, Sailors' Union of the Pacific and Marine Cooks and Stewards, Sailors' Union of the Pacific, Pacific Coast Marine Firemen, Oilers, Watertenders and Wipers Association, Marine Cooks and Stewards Union, and each of them, and its officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, or any of them, are hereby restrained from insisting, demanding or requesting that the shipping articles prescribed by 46 U.S.C.A. § 713 be supplemented or modified by any rider limiting the period of the voyage or granting the seamen any right to terminate their articles prior to the time that the vessel has concluded its normal scheduled return voyage, has discharged and delivered all of its cargo, and has been shifted to a berth designated by the employer for its safe mooring should there be a resumption of strike activity and from in any manner interfering with or affecting the orderly sailing of vessels on schedule for their normal voyage to completion of the work as hereinbefore set forth;

Upon completion of the voyage in accordance with the foregoing, the seamen shall be paid off by mutual consent.

2. That the said defendants and their respective appropriate officers, agents, servants and employes are hereby directed to instruct immediately all persons represented by such unions who have been accepted for employment on vessels to sail pursuant to the provisions of the preliminary injunction entered on April 13, 1962; that they are to sign on normal shipping articles in the form prescribed by statute without the inclusion of any special riders limiting their employment to a period of eighty (80) days.

3. That the standard form of shipping articles executed by the seamen and members of defendant unions during the duration of the preliminary injunction shall contain the express provision that the period of the hiring shall not extend beyond the duration of the particular voyage undertaken and that the articles shall terminate and expire upon the completion of the voyage in the manner particularly provided for in paragraph (2) hereof.

4. That the said defendant unions furnish the necessary replacements for crew members so that any vessel sailing pursuant to the provisions of the preliminary injunction can, without interference by strike activity, continue to operate until all cargo loaded for the return voyage to the United States is taken to its port of destination and is discharged and delivered and the vessel is shifted to an appropriate and safe berth as directed by the employer.

5. That the defendants Seafarers' International Union of North America, Pacific District, comprising Marine Firemen's Union, Sailors' Union of the Pacific and Marine Cooks and Stewards, Sailors' Union of the Pacific, Pacific Coast Marine Firemen, Oilers, Watertenders and Wipers Association, and Marine Cooks and Stewards Union, and their respective appropriate officers, agents, servants, employes, members and attorneys, and all persons in active concert or participation with them, or any of them, are hereby restrained from in any manner encouraging, ordering, aiding or taking part in any concerted activity of refusing or failing to sign on articles that are provided in accordance with paragraph 3 hereof, or to modify, alter or supplement or change any said articles.

6. That nothing in this order shall be construed to require an individual employe to render labor or service without his consent nor to make the quitting of his labor or service by an individual employe an illegal act.

7. That a photostatic copy of the within supplementary order shall be affixed to the said articles when executed by the seamen during the duration of the preliminary injunction and made a part thereof, with the same force and effect as if fully and completely set forth therein, and shall constitute notice to the individual members of defendant unions.

8. That a copy of this Supplemental Order shall be served upon the said defendant unions by the United States Marshal as soon as is practicable.