## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## E. A. HOLCOMBE and J. N. Holcombe, d/b/a Holcombe Armature, Respondent.

No. 20388.

United States Court of Appeals
Fifth Circuit.

Dec. 11, 1963.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Seymour Strongin, Atty., Arnold Ordman, Gen. Counsel, Elliott Moore, Atty., N. L. R. B., Washington, D. C., for petitioner.

Alexander E. Wilson, Jr., Wilson, Branch, Barwick & Vandiver, Alexander E. Wilson, III, Atlanta, Ga., for respondent.

Before TUTTLE, Chief Judge, and JONES and BELL, Circuit Judges.

TUTTLE, Chief Judge:

This petition by the National Labor Relations Board is very small in substance. The Board charged the respondent with violating Sections 8(a) (3) and (1) of the Act by suspending eight employees because, after they had been told that a fellow employee, Barnes, had been discharged for cause,[1] they had walked off the job. Thereupon, respondent sent letters to the eight employees suspending them for the balance of the week.

During part of the time the eight employees were off, they formed a picket line. The day of the walk-out one Crouch was employed by the company for the first time. He worked that day but the next day he did not report for work, but instead he spent part of his time on the picket line. He was dropped from the company's payrolls on the asserted ground that he had failed to show up for work. This act is also charged by the Board to be a violation of Section 8(a) (3) on the ground that the respondents discharged Crouch for his Union activity in participating in the picketing. Finally, the Board charges an ordinary 8(a) (1) violation based on a conversation between an employee and one of the respondents that the company would take retaliatory measures if the Union drive was successful.

As to the first contention by the Board, we note that the Supreme Court in the latest pronouncement on the subject in N.L.R.B. v. Washington Aluminum Co.,

---

1. Although active in an attempt to organize a Union, the Board sustained the respondent's contention that Barnes had been legally fired for having negligently burned out the motor on his lathe.

370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298, has made it plain that not every concerted activity is protected under Section 7 of the Act.[2] The Supreme Court there said:

"It is of course true that § 7 does not protect all concerted activities, but that aspect of the section is not involved in this case. The activities engaged in here do not fall within the normal categories of unprotected concerted activities such as those that are unlawful, [citing Southern Steamship Co. v. National Labor Relations Board, 316 U.S. 31, 62 S. Ct. 886, 86 L.Ed. 1246] violent [citing National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627] or in breach of contract [citing National Labor Relations Board v. Sands Manufacturing Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682]. Nor can they be brought under this Court's more recent pronouncement which denied the protection of § 7 to activities characterized as 'indefensible' because they were there found to show a disloyalty to the workers' employer which this Court deemed unnecessary to

carry on the workers' legitimate concerted activities [citing Labor Board v. Local Union No. 1229, International Brotherhood of Electrical Workers, 346 U.S. 464, 477, 74 S.Ct. 172, 98 L.Ed. 195]."

Here, to be sure, the Board found that Barnes had been discharged for justifiable cause. Further the Board found that at the time Barnes was discharged neither of the respondents had heard about any organization movement among the men.[3] The Board then found "these men walked out spontaneously over the discharge of Barnes under the mistaken notion that Barnes was discharged to discourage membership and activity in the Union."

When the men requested the right to come back to work on the following morning they were told that the matter was under investigation, and were, in fact, not reinstated for a week. The Board found this amounted to a suspension as a punishment for their action in leaving their jobs because of their concerted activity and that such conduct by the respondents discouraged membership and activity in the Union. As none of the jobs had been filled between the time they left on May 22, and their return to

2. Section 7 provides:
 "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

3. The findings with respect to this were as follows:
 "When, shortly after lunch on May 22, some of the employees learned that Barnes had been discharged, some of the employees gathered in the plant near the office and asked to talk with the Holcombes. There had been no talk of a strike, and the gathering was entirely spontaneous, the men obviously considering that the discharge was motivated against their then-current self-organizing efforts. When the two Holcombes arrived on the scene the men claimed that Barnes had been fired because of his union activities. In substance both Hol-

combes credibly testified that this was the first either of them heard about any organizing movement among the men, but the record leaves no room for doubt that they heard about the employees' signing union cards at this point. This was also the first time that the Holcombes had been confronted by a group of employees. Earl Holcombe told the group that Barnes had been fired by the office, that it was none of their business why he was fired, that the Company did not ask any of them when it hired them if it could hire them and the Company was not going to ask them if it could fire anybody. Holcombe added that nonetheless he would show them why Barnes was fired. He then removed the cap from the switch on Barnes machine and pointed out that it was evident that on one side the points were completely burned out and on the other side they were only slightly used. One of the Holcombes pointed out that Barnes had purposefully disregarded the instructions on how to operate the machinery."

work on May 28, the Board found that they were entitled to their jobs upon request, and that they are now entitled to back pay for the six-day period of their suspension.

 There can be no substantial doubt but that normally a spontaneous or planned walk-out in protest against the firing of another employee is protected activity. N.L.R.B. v. J. Mitchko, Inc., 3 Cir., 284 F.2d 573. N. L. R. B. v. Solo Cup Co., 8 Cir., 237 F.2d 521. Summit Mining Corp. v. N. L. R. B., 3 Cir., 260 F.2d 894. To be sure, in the last cited case, the Court said, "[A]s long as the strikers in *good faith* thought that the discharges had been effected because of union activities or for some other reason proscribed by the Act their concerted activity was within the protection of Section 7 of the Act." Here there is no precise explicit finding by the trial examiner or the Board that the eight employees did in good faith believe that Barnes had been fired without cause when they walked out, although the language employed by the fact finder (fn. 3 above) speaks of "the mistaken notion that Barnes was discharged to discourage membership, etc." We think that we need not decide whether this amounted to a positive finding that the employees were then of the good faith belief that Barnes' discharge was for an unlawful purpose. We conclude that the conduct of the employees in protesting his discharge in the manner they chose was concerted activity. Of this there can be little doubt. We also conclude that it was protected, because even though the company had grounds for firing Barnes, the employees had the right to protest the firing as too harsh or because they thought the standard of care in the operation of the equipment was too high. Even though upon more careful reflection they might not have reacted as they did, the wisdom or un-wisdom of their conduct is not a test.

 Of course, once they walked off the respondents could have replaced all of them if it had done so before they requested reinstatement. However, in this case the request for reinstatement came very quickly, and the Company could not impose sanctions for the short-lived strike. Having done so, they violated Section 8(a) (3) of the Act. However, we can not find that this conduct on their part was done "to discourage membership or activity in the union" about which respondents did not know until the very moment of the walk-out.

 The Board also charges that the discharge of Crouch violated Section 8 (a) (3) because of his participation in the protected activities. This employee had worked only one day and did not report back for duty the following day. We conclude that there is not sufficient evidence on the record as a whole to warrant the finding by the trial court that the company actually knew that Crouch failed to return to work because of the fact that he wished to walk on the picket line. There is no evidence that he had been identified by the respondents with the protected concerted activity.

This disposes of all of the matters presented in this petition except for the alleged 8(a) (1) violation based on the conversation between an employee, Gunnin, and Earl Holcombe, one of the respondents. Representing, as it does, almost the only evidence touching on any possible anti-union bias by the company, the testimony concerning this conversation is here reproduced in full.

"Q When did you go back to work? A The following Monday. I don't remember the date.

"Q What, if anything happened to you on Monday, the 28th of May? A Well, now; I don't know if this is the right date or not, but I was there early one morning and walked in the office—they didn't call me in there—I owed them some money and I was talking to them and had a conversation and they said—

"Q Who is they? A I was talking to 'Shorty' first; that's Earl, and he asked me what did I seem to think the trouble was and I told him that I thought—I didn't know

about the rest of them—but I thought they fired Barnes for having union activities. They said, 'No, that's not the reason'. He went on to talk. He said, I think we all would do better without one if we would all get together and talk and talk it over. He didn't want to have any hard feelings with anybody and I told him that I didn't either. And he asked me what did I think would make the men happy, and I told him. I told him a credit union, a retirement plan, and to make more money. I told him that I didn't think any of us made enough money and stuff like that. And he said, 'Well, do you think you could talk to some of the boys' and I said, 'No, that that would just put me on the spot'.

"Q Do you recall anything else that was said in this conversation? A Well, Jimmy said that some of us had already lost money, walking the picket line. He said that he wasn't going to pay anybody for the picket line—walking the picket line. He didn't think it was right.

"Q Do you recall anything else that was said? A No, sir; not right off hand.

"Q Tell us again what you recall Mr. Jimmy Holcombe saying? A We were just talking about—he said something about we had already lost money—we were wanting more money but we had lost money already by walking the picket line— we weren't going to get paid for it. He didn't think it was right to pay a man for walking the picket line. That's just about all that I remember about it.

"Q. Do you recall anything else that Mr. Earl Holcombe said in that conversation? Do you recall anything else that Mr. Earl Holcombe said in the latter part of his conversation? A No, I can't recall anything else.

"Q Was anything said, do you recall, about hiring practices? A

He said something to the effect—I won't say this is his same words— that either one of them—I said—I don't know if this is his exact words that either one of them said, but he said something to the effect if they can't get a union—I mean if they did get a union—they didn't want a union—it would make it rough on us to where we couldn't stand it. In other words, we would not like to work there. It would just make it hard.

"Q What if anything was at that time said about money? Was anything said about money? A In other words, that's what I think I went in there for. I still owe them money as a matter of fact. I think that's the reason I went in there to begin with, to tell them when I was going to pay them some money.

"Q What, if anything, was said about the plant itself? Was anything said about the plant itself? A No, sir; not that I can recall.

"Q Do you recall him saying anything about selling the plant, if anything? A They said something to the effect if they had to, what they had was paid for; they could sell. Sell the place and rent it, I think he said, or something to that effect."

Thus it is that the Board construes this confused language, brought out only after the most pointed leading questions, to amount to a statement by respondents that if the Union won over a majority of the employees, management would make it rough on the employees to where they couldn't stand it and, further, that if a Union came in, the management would sell the plant and close up the business.

We think this contention is far too tenuous to be supported by the testimony that is quoted above. On a record, such as this, where there is no real showing of anti-union bias on behalf of the respondents, we think that neither this conversation nor the one later had with Crouch in which the Board finds that respondents asked Crouch to sign an affi-

davit to the effect that he had been threatened by members of the picket line constitutes substantial evidence, when we consider the record as a whole, constitutes an 8(a) (1) violation.

The petition for enforcement will be enforced as to the order requiring reimbursement during the period of suspension and will be denied as to the reinstatement or reimbursement of Crouch and as to the remaining alleged 8(a) (1) violations.