**SPENTONBUSH/RED STAR COMPANIES, Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner,**

**Local 333, United Marine Division, International Longshoremen's Association, AFL–CIO, Intervenor.**

No. 559, Dockets 96–4019(L), 96–4053(XAP).

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1996.

Decided Feb. 13, 1997.

Aaron J. Schindel, New York City (Neil H. Abramson, Marc A. Mandelman, Proskauer Rose Goetz & Mendelsohn LLP, New York City, of counsel), for Petitioner–Cross–Respondent.

Robert J. Englehart, National Labor Relations Board, Washington, DC (Frederick L. Feinstein, General Counsel, Paul J. Spielberg, Deputy Assistant General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Washington, DC, of counsel), for Respondent–Cross–Petitioner.

Seymour M. Waldman, New York City (Vladeck, Waldman, Elias & Engelhard, P.C., New York City, of counsel), for Intervenor.

Before: VAN GRAAFEILAND, McLAUGHLIN and JACOBS, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Spentonbush/Red Star Companies (Spentonbush), a tugboat and barge business, has petitioned this Court to review an order of the National Labor Relations Board in favor of Local 333, United Marine Division, International Longshoremen's Association, AFL–CIO (the Union). In a decision reported at 319 NLRB 988, 1995 WL 785733, the Board held that Spentonbush violated section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), by refusing to bargain collectively with its employees. The NLRB has cross-petitioned for enforcement of its order, and the Union has intervened in support of the order.

The Board found among other things that Spentonbush violated the Act by demanding that its tugboat and barge captains be excluded from the bargaining unit created by its collective bargaining agreement with the Union because, Spentonbush says, they are "supervisors". The Act defines "supervisor" as

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to

recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine· or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(ll). The Act provides further that a "supervisor" is not an "employee" for the purpose of the Act. *See* 29 U.S.C. § 152(3). Because the captains' status as either supervisors or employees played a major role in the Board's consideration of a § 8(a)(5) violation, we address it first.

During the time at issue herein, Spentonbush operated a fleet consisting of eleven tugboats and eleven barges. Although the company's headquarters were in the New York City area, its operations extended from Norfolk, Virginia to Boston and Chicago. Indeed, in some years one of its tugs left New York in April and did not return from the Chicago area until December. The remaining tugs spent a relatively small portion of their time shepherding large vessels in and about the New York harbor. The bulk of their work was towing or pushing the barges containing petroleum or other liquid products up the Hudson River to storage facilities and refineries.

The tugs varied in length from 75 feet to 125 feet. The barges, which varied in length from 240 feet to 440 feet, carried between 840,000 and 4,620,000 gallons of gasoline. Each tug had a complement of six men consisting of a captain, a mate, a cook, a chief engineer, and two deckhands. Each barge's crew consisted of a captain and a mate.

For many years Spentonbush and Local 333 had been parties to a series of collective bargaining agreements, one of which was scheduled to expire on February 15, 1988. Because this was a period of severe economic hardship for companies such as Spentonbush, it sought concessions from the Union on wages, overtime and manning requirements. A meeting was held on February 14 which did not result in a meeting of the minds on these issues.

The evidence was substantial, indeed well-nigh overwhelming, that the status of Spentonbush's captains as supervisors was not an issue at this meeting. Martin Oppenheimer, Spentonbush's counsel, testified:

## CROSS EXAMINATION

Q No specifics were discussed across the bargaining table about the duties and responsibilities of the captains, were they?

A No specific names as far as I can recall, were ever discussed. The principle that supervisors should not be part of the unit was a principle that was discussed with the company, asserting again and again that they should not be and the union asserting that they did not want to diminish the size of the unit. They wanted to include supervisors and that supervisors if eliminated might be terminated and therefore might lose jobs they have right now.

Q The company did not offer any specific instances, evidence, examples to show that tug captains were not supervisors.

A That was never put into issue by the union. The union never asserted they weren't supervisors.

\*    \*    \*    \*    \*    \*

BY THE JUDGE:

Q Mr. Oppenheimer, did you sense that the union in the negotiations never said that the captains were not supervisors, is that correct?

A That's correct.

Q Did they ever concede that they were?

A Yes. Indeed they addressed them as supervisors.

Q They used that term?

A Absolutely.

Q And in what particulars did they do it.

A Whenever the matter was addressed the company took the position supervisors should not be part of the unit. The union asserted that by excluding supervisors from the unit, a, the numbers we represent diminish and b, you will then have a right to discharge them and in a sense they are losing the protection they now have. The union never claimed that the tug captains or barge captains were not supervisors. That was not an issue in dispute.

Q How about the mates?

A They weren't specifically addressed. The legal issue was not addressed. They never questioned our legal right to do so. What they said is they would not—any more than they questioned our legal right to eliminate the cooks. But they simply said that was unacceptable to them as a bargaining matter.

Q Are you saying in essence that by their conduct they conceded that these captains are supervisors but they did not expressly refer to them as supervisors?

A They expressly referred to them as supervisors.

Union delegate James Morrissey testified that the issue of the supervisor status of the tug captains and barge captains was not a strike issue for the Union. Union delegate Peter Gale and Spentonbush's vice president Joseph Gehegan agreed. On August 12, 1988, the Union filed an unfair labor charge which included no allegation with respect to the supervisory status of Spentonbush's captains. General Counsel conceded to the ALJ, "Never said it included it, your Honor." The Union's first reference to this issue was contained in its third charge, made almost a year after the Union went on strike.

Our reading of the record convinces us that, during the negotiations that preceded the strike, the Union did not make an issue of the captains' status as supervisors. The Union's position was, supervisors or not, the captains should remain employee members of the bargaining unit. This, the law does not permit. The Board nevertheless elected to treat the captains' supervisory status as if it was a pivotal issue in the parties' pre-strike negotiations, and we perforce must follow suit. However, we part company from the Board in the result that it reached through this warped interpretation of the facts.

In 1971, Spentonbush or its predecessor corporate entity issued a "Manual of Operating Procedures and Regulations" for use by its "Tugboat Operation," to be considered the "primary fleet operating order." The Manual, which was to be carried aboard ship at all times, contained the following provisions relating to the captains of its tugs:

The master has absolute command of the vessel and has full authority over all phases of its operation at all times, both in port and at sea.

* * * * * *

The master has full authority over all persons on board the vessel, and his authority must be maintained.

Masters must require that their orders be carried out, and any neglect or refusal to do so must be met with appropriate disciplinary action.

* * * * * *

The master may rely on the company and its representatives for support in the lawful and proper execution of their duties and the maintenance of discipline.

* * * * * *

The master has full authority to dismiss from his vessel any officer or crew member. It is expected that this power will be used judiciously and only for proper cause.

Dismissal from a vessel is subject to review by the Personnel Department prior to dismissal from the company.

Causes for dismissal can vary from infringement of regulations to consistently substandard performance.

* * * * * *

Masters are the direct representatives of the company, and as such, their decisions and actions are usually binding on the company. They should carry out the responsibilities of the office with this in mind using best judgment at all times.

Company shore management are at all times ready to advise and assist masters in the performance of their duties.

█ The foregoing provisions did not establish new rules of conduct and authority for the company's tug captains; they simply restated general rules and regulations that had been in existence for many years. Pursuant to this long-standing tradition, a ship's captain is the ship's master. *See Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir.1986); *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir.1978), *cert. denied*, 440 U.S. 959,

99 S.Ct. 1499, 59 L.Ed.2d 772 (1979); *NLRB v. Delaware–New Jersey Ferry Co.,* 128 F.2d 130, 137 (3d Cir.1942). Testimony as to these duplicative or coincident roles was presented to the Administrative Law Judge, and its accuracy was conceded and affirmed at oral argument before this Court.

The tug captains thus occupied a position that was markedly different from that of a foreman or lead person in a shore-based enterprise. *See June T, Inc. v. King,* 290 F.2d 404, 406 n. 1 (5th Cir.1961). This difference was summarized by the Supreme Court in *Southern Steamship Co. v. NLRB,* 316 U.S. 31, 38, 62 S.Ct. 886, 890, 86 L.Ed. 1246 (1942), in the following, oft-quoted language:

> Ever since men have gone to sea, the relationship of master to seaman has been entirely different from that of employer to employee on land. The lives of passengers and crew, as well as the safety of ship and cargo, are entrusted to the master's care. Every one and every thing depend on him. He must command and the crew must obey.

A multi-volume work entitled Limited Master, Mate & Operators License Study Course, Book 4 Revised Edition "G", Editor Richard A. Block, 1994, contains the following, more-detailed description of a master's duties:

> He must maintain proper order and discipline on board at all times. He shall be held responsible for any disorderly conduct or violation of the law or of rules covered in the manual, which might have been prevented by proper administration and supervision on his part. He shall not permit any alcoholic beverages, illegal drugs or other intoxicants on board his vessel at any time.

*Id.* at SB–4.

> The Master has full authority over all officers and unlicensed personnel on the vessel and his orders must be obeyed in spirit and to the letter by all persons on board.

*Id.* at SB–5.

■ The above-described position and powers of a ship's master were not derived from the civil law of master and servant nor from the common law but arose instead from the common usages and jurisprudence of the middle ages. *The China,* 74 U.S. (7 Wall.) 53, 68, 19 L.Ed. 67 (1868). Statutes which invade such long-established and familiar principles should be read with a presumption favoring their retention unless a statutory purpose to the contrary is evident. *See Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 263, 99 S.Ct. 2753, 2757–58, 61 L.Ed.2d 521 (1979) (citing *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014–15, 96 L.Ed. 1294 (1952)). Moreover, in devising remedies for unfair maritime labor practices, the NLRB should take into account other equally important objectives, such as safety of ships, their crews, the public, and the environment. *See Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 903, 104 S.Ct. 2803, 2814–15, 81 L.Ed.2d 732 (1984); *Peninsular & Occidental S.S. Co. v. NLRB,* 98 F.2d 411, 414 (5th Cir.), *cert. denied,* 305 U.S. 653, 59 S.Ct. 248, 83 L.Ed. 423 (1938).

■ Of course, the well-established rules for the guidance of ships' masters contain no definition of the term "supervisor." For this, we must look to the NLRA. However, masters' established duties and prerogatives should be taken into consideration in determining whether they perform any of the acts described disjunctively in the statutory definition. *See Amalgamated Local Union 355 v. NLRB,* 481 F.2d 996, 999 (2d Cir.1973).

■ As we already have observed, ships' masters occupy positions that are markedly different from those of shore-based lead men or foremen, and the relationship of master and crewman is entirely different from that of employer and employee on land. *See Mt. Vernon Tanker Co. v. NLRB,* 549 F.2d 571, 575 (9th Cir.1977). "The duty of obedience owed by a deckhand to obey the orders of a licensed ship's officer is greater than that of a worker at a bench in a factory to obey the direction of his foreman." *Delaware–New Jersey Ferry Co., supra,* 128 F.2d at 137. However, the "approach used" by the ALJ in the instant case was based on the review of the evidence relating to the statutory indicia used by the Board in *Beverly Enterprises–*

*Ohio d/b/a Northcrest Nursing Home*, 313 NLRB 491 (1993).[1]

The ALJ stated that he "attach[ed] no probative weight to the many and varied conclusory materials proffered by [Spentonbush], including personnel folder notations, otherwise unsupported, that some captains had disciplined crew members or recommended discipline, and including operation manual provisions, which apparently went unread and which stated that its tugboat captains had full responsibility over the other crew members." 319 NLRB at 1000. Illustrative of the personnel folder notations that the ALJ disregarded were the following:

(1) an employee form for Marten Madsen containing a notation "Fired by Capt. Wills."

(2) a memo from Capt. Borek to Spentonbush personnel detailing Borek's problems with the performance of a Mr. Collins aboard the Newport, and concluding that "I sincerely regret that I had to make the decision to dismiss Mr. Collins, however, my major concern is for his safety and the safety of my crew especially in dangerous situations."

(3) a letter from Capt. Arnold Meland to M. Mellis stating that "This letter pertains to the fact that the mate on my tug New Haven, Tom Crosby has been given notice that if he cannot handle his job pertaining to the New Haven Pilot association, he will be dismissed and fired."

(4) an employee form for George Shelley containing the notation "Discharged by [Capt.] T. Klebold—could not handle job."

■ This evidence was probative and should have been considered. The ALJ's disregard of it is another example of the practice followed all too often by the Board of rejecting evidence that does not support the Board's preferred result. Moreover, because the exposition of the captains' authority contained in the company's Operation Manual simply restated the duties and pre-

rogatives that existed under the law, the ALJ's statement that he disregarded the Manual is meaningless unless he also disregarded the law that it summarized.

However, we will not dwell on this aspect of the case. To discuss all eleven indicia of supervisory authority would unnecessarily prolong this opinion, and our failure to do so should not be construed as approval of the results reached by the Board. Regardless of the ALJ's questionable rulings on the issues of hiring, transfer, etc., the conclusion is inescapable that Spentonbush's tug masters exercised authority responsibly to direct their crews in matters that were not merely routine or clerical in nature and that required the use of independent judgment.

■ The term "responsibly to direct" has a well-established meaning. *See NLRB v. KDFW–TV, Inc.*, 790 F.2d 1273, 1278 (5th Cir.1986):

"To be responsible is to be answerable for the discharge of a duty or obligation." *[Maine] Yankee Atomic, etc. v. NLRB*, 624 F.2d 347, 361 (1st Cir.1980) (quoting *Ohio Power Co. v. NLRB*, 176 F.2d 385, 387 (6th Cir.), cert. denied, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1949)); see also *Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1383 (9th Cir.1976); *NLRB v. Fullerton Publishing Co.*, 283 F.2d 545 (9th Cir.1960). In determining whether "direction" in any particular case is responsible, the focus is on whether the alleged supervisor is "held fully accountable and responsible for the performance and work product of the employees" he directs. *[Maine] Yankee*, 624 F.2d at 361.

Illustrations of how tug masters are held accountable and responsible for the performance and work product of tug employees are numerous. As one example, we may look to a deckhand's handling of hawsers, which the ALJ described as "standardized functions." The Coast Guard prepares regulations governing the length of towing hawsers, 33 U.S.C. § 152, and a tug captain may have his license suspended for violating these reg-

1. The patient-care analysis used by the Board in *Beverly Enterprises* is itself of questionable precedential value in view of the Supreme Court's subsequent decision in *NLRB v. Health Care & Retirement Corp.*, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994).

ulations. 33 U.S.C. § 153. In line with the concept that "application of the rules of the nautical road cannot be fixed precisely," *Mystic Steamship Corp. v. M/S Antonio Ferraz,* 498 F.2d 538, 543 (2d Cir.1974), we have held that the regulation governing the hawser length "does not delineate a precise and clearly defined duty, but, instead, calls for the use of interpretation and judgment on the part of the master." *In re Interstate Towing Co.,* 717 F.2d 752, 756 (2d Cir.1983).

There are a number of statutes and regulations dealing with pollution of waters and harbors, *see, e.g.,* 33 U.S.C. § 407 (deposit of refuse in navigable waters) and 33 U.S.C. § 441 (deposit of refuse prohibited), and penalties are imposed upon masters for violations of these provisions. *See* 33 U.S.C. §§ 412, 442.

The Secretary of Transportation is authorized to define and establish anchorage grounds for vessels in harbors and navigable waters. A violation of any of these regulations subjects the owner, master or person in charge of a vessel to penalties. *See* 33 U.S.C. § 471.

A master of a tug at least 26 feet in length is subject to a penalty if he permits the tug to be operated by one not duly licensed to do so. *See* 46 U.S.C. §§ 8904, 8906.

It is informative to note that in some of the Coast Guard regulations the master is identified as a "marine employer." *See* 46 C.F.R. § 4.03–45. This description is used in 33 C.F.R. §§ 95.010 and 95.050(b), which provide that "[i]f the marine employer has reason to believe that an individual is intoxicated, the marine employer shall not allow that individual to stand watch or perform other duties."

The above examples, while not exhaustive, clearly demonstrate a status for a vessel master that is quite different from that of a crew chief in a land-based activity. We find no merit in the argument that the responsibilities described are imposed by law, not the employer. As one witness put it, Coast Guard regulations are company policy. We logically assume that Spentonbush intended and required that its masters obey the mari-

time and navigation law, and such obedience surely was in Spentonbush's interest.

Although, unlike the situation in *Maine Yankee Atomic Power Co. v. NLRB,* 624 F.2d 347 (1st Cir.1980), we are not concerned here with a possible atomic disaster, the effects that the mishandling of over four million gallons of gasoline might have upon the waterways and the surrounding areas would also be a disaster. Like the *Maine Yankee* court, we are at a loss to understand how the grave responsibility for preventing such a catastrophe can be swept aside by the Board as routine and clerical. It was the duty of Spentonbush's captains, as masters, to supervise their crews so that no such disaster would occur.

In this respect, we see no difference between the captain of the tug and the captain of the barge. The tug captains "have no authority over the master or hands of the towed vessel beyond such as is required to govern the movement of the flotilla." *Stevens v. The White City,* 285 U.S. 195, 200, 52 S.Ct. 347, 349, 76 L.Ed. 699 (1932). "In all other respects and for all other purposes the vessel in tow, its cargo and crew, remain under the authority of its master; and, in emergency the duty is upon him to determine what shall be done for the safety of his vessel and her cargo." *Id.* Refutation of the argument that the barge captains' decisions are simply routine can be found in the following excerpt from another decision of the Board, *Sun Refining & Marketing Co.,* 301 NLRB 642, 649 (1991):

> Furthermore, even if a particular operation is performed again and again, it does not necessarily follow that it is routine. In recent months, the world has been painfully reminded in a series of highly publicized incidents of the fact that because of the size, complexity, and cargo which it carries, a supertanker is an extremely dangerous place to work. Constant monitoring and accountability is essential. Otherwise repetitive operations must be performed under constantly changing conditions which significantly vary the individual components of the operation and the order and the manner in which they are performed. Mistakes can

and do result in disastrous consequences. In the words of Wayne Richard McKee, retired tanker captain and presently a marine consultant, "You just don't tell somebody to go open a valve and walk away from him. You watch that he opens the valve that you want him to open. If you're hooking up hoses, you don't just say go haul those hoses up. Each hose has a different connection they go to. You have to make sure that the gasoline goes to where you want the gasoline line connected ... somebody has to be there to tell him what riser these hoses are going to go on."

Although *Sun Refining* concerned a tanker rather than a barge, the appropriateness of the foregoing observations to a barge containing over four million gallons of gasoline is strikingly apparent.

The deference owed by the judiciary to the decisions of the Board has been stated on numerous occasions and need not now be reiterated here. However, the Board's biased mishandling of cases involving supervisors increasingly has called into question our obeisance to the Board's decisions in this area. *See, e.g., NLRB v. Winnebago Television Corp.,* 75 F.3d 1208, 1214 (7th Cir.1996); *Schnuck Markets, Inc., v. NLRB,* 961 F.2d 700, 704 (8th Cir.1992); *Children's Habilitation Center, Inc. v. NLRB,* 887 F.2d 130, 132 (7th Cir.1989); *NLRB v. Res–Care, Inc.,* 705 F.2d 1461, 1466 (7th Cir.1983); *NLRB v. St. Mary's Home, Inc.,* 690 F.2d 1062, 1067 (4th Cir.1982).

■ Recognizing that the NLRB earns and forfeits deferential judicial review by its performance, *Children's Habilitation, supra,* 887 F.2d at 132, the above-cited cases hold in substance that the Board's manipulation of the definition of supervisor has reduced the deference that otherwise would be accorded its holdings. *See also NLRB v. Porta Sys. Corp.,* 625 F.2d 399, 405 (2d Cir.1980) (Van Graafeiland, J., concurring in part and dissenting in part) (challenging the "result-oriented" method of determining supervisory status). Giving the Board's decision the "more probing" review suggested in the above cases, we conclude that the Board

clearly erred in denying Spentonbush's captains status as supervisors.

We turn therefore to the nature of the strike and the employees' offer to return to work.

During the period that the Union was negotiating with Spentonbush, it also was negotiating with seven other tug companies with which it had agreements due to expire on February 15, 1988. A Union meeting with those companies was scheduled to be held prior to February 15, and Spentonbush's representatives were told at their February 14th meeting that the Union might seek an extension of its contract. Spentonbush was given to understand that it would hear again from the Union before its contract expired. However, the next thing Spentonbush heard was that the Union had decided to strike all the negotiating companies.

Thereafter, Spentonbush and Union representatives conferred on March 18 and April 29 but were unable to resolve their economic differences. In the meantime, Spentonbush hired replacement workers at salaries consonant with its offers to the striking employees. On August 3, the Union filed an unfair labor practice charge asserting that Spentonbush had violated the Act by failing to bargain in good faith for a successor collective bargaining agreement, by locking out its employees in furtherance of its unlawful bargaining conduct and by unlawfully making unilateral changes in the terms and conditions of employment. Spentonbush denied the charges.

On September 2, the Union's president wrote to Spentonbush making an "unconditional offer" on behalf of the Union "to return to work under the terms and conditions that existed under the expired collective bargaining agreement." Spentonbush replied that the offer was unacceptable because Spentonbush had changed the wage rates following the strike. On September 20, the Union responded that because of Spentonbush's "unlawful conduct" its members were entitled to return under the terms and conditions of the expired contract. Spentonbush responded that it had not engaged in unlawful conduct and therefore the Union's offer was conditional.

On January 6, 1989, the Union filed a second unfair labor practice charge. Again Spentonbush denied it. On January 19, 1989, the Union filed a third charge which read as follows:

> Since on or about six months prior to the filing of this charge and continuing to date, the above-named employer has failed and refused to bargain in good faith with Local 333, United Marine Division, ILA, AFL–CIO, the exclusive bargaining representative of the crew members on its vessels by, *inter alia,* withdrawing recognition of the Union as the representative of the captains and unilaterally removing work previously performed by members of the bargaining unit and assigning it to non-bargaining unit members.

The mention in this charge for the first time of Spentonbush's treatment of its captains as supervisors was an obvious attempt to put Spentonbush in the position of having bargained to impasse on an issue that was not a mandatory subject of bargaining and thus having precipitated an unfair labor practice strike. This attempt must fail.

■■■■■ Even if we accept the Board's finding that Spentonbush insisted "throughout bargaining" that its captains were supervisors and that the Union "strenuously opposed" what we now hold to have been a proper categorization of that office, Spentonbush did not commit an unfair labor practice if it did not argue its position to an impasse that led the union to strike. Although neither an employer nor a Union can insist upon the grant of a non-mandatory bargaining demand as a condition for reaching agreement on mandatory issues, this does not mean that non-mandatory issues cannot be considered at all in the bargaining process. What the Act prohibits is insistence to the point of impasse upon a non-mandatory proposal so that acceptance of the proposal becomes a condition precedent to accepting any collective bargaining contract. *See Swatts v. United Steelworkers of America,* 808 F.2d 1221, 1226 (7th Cir.1986); *National Fresh Fruit & Vegetable Co. v. NLRB,* 565 F.2d 1331, 1334–37 (5th Cir.1978); *Hess Oil & Chemical Corp. v. NLRB,* 415 F.2d 440, 446–47 (5th Cir.1969), *cert. denied,* 397 U.S. 916, 90 S.Ct.

920, 25 L.Ed.2d 97 (1970); *Oil, Chemical & Atomic Workers Int'l Union v. NLRB,* 405 F.2d 1111, 1117 (D.C.Cir.1968). Insistence and opposition occur in most bargaining sessions. That is what bargaining is all about. To say, as the Board did, that the employer insisted throughout bargaining that the captains were supervisors does not describe an unfair labor practice. " 'The [employer] had a right to present, even repeatedly, a demand concerning a non-mandatory subject of bargaining, so long as it did not posit the matter *as an ultimatum.'* " *Philip Carey Mfg. Co. v. NLRB,* 331 F.2d 720, 727 (6th Cir.) (quoting *International Longshoremen's Ass'n v. NLRB,* 277 F.2d 681, 683 (D.C.Cir.1960)), *cert. denied,* 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92 (1964).

We find no credible evidence that negotiations between Spentonbush and the Union were derailed by Spentonbush's insistence that its captains be treated as supervisors. We note that initially Spentonbush proposed to remove both the captains and the mates from the bargaining unit and that the Union indicated that this would be unacceptable. At the February 14th meeting, Spentonbush acquiesced as to the mates and proposed only the removal of captains. On February 15, without a word to or from Spentonbush, the Union conducted a meeting at which some 2000 employees of the seven bargaining companies attended. Proceedings apparently were conducted in a raucous, pep-rally atmosphere. *See McAllister Bros., Inc.,* 312 NLRB 1121, 1127 (1993). By a single, pooled, show of hands, an apparent majority of the 2000–member group voted to strike all seven employers. We have no way of knowing how many Spentonbush employees were in that majority. Moreover, because all the employers were beset by the same economic problems and the status of captains was an issue in only the Spentonbush negotiations (and only a minor one at that), we are unable to determine what role, if any, the status of Spentonbush's captains played in the strike vote. *See United Paperworkers Local 620 (Int'l Paper Co.),* 309 NLRB 44, 44–45, 1992 WL 281693 (1992).

■■■ This inability constitutes one more reason why the Board's decision cannot

stand. If the strike was an unfair labor practice strike, Spentonbush was bound to accept the Union's "unconditional" offer of reinstatement. *NLRB v. Fotochrome, Inc.,* 343 F.2d 631, 633 (2d Cir.), *cert. denied,* 382 U.S. 833, 86 S.Ct. 76, 15 L.Ed.2d 76 (1965). However, if the strike was an economic one and replacements had been hired for the striking workers, this would not be so. *See National Fresh Fruit & Vegetable Co., supra,* 565 F.2d at 1337.

The NLRB argues that Spentonbush committed a separate unfair labor practice by unilaterally changing its terms and conditions of employment after the Union began its strike, and that, by virtue of that unfair labor practice, Spentonbush was bound to accept the Union's unconditional offer to return to work at the original pre-negotiations terms and conditions. This argument might have had merit if the negotiations concerned increases in salary and benefits, so that the offer to return would represent an interim concession by the Union (pending the outcome of NLRB proceedings) and could be accepted without payment by the employer of wages and benefits that could not be recovered from its employees. In this case, however, the NLRB's argument ignores the fact that the negotiations were for reductions in salary and benefits, so that the offer to return to work was an offer to accept wages and benefits that exceeded the Union's own negotiating position, and to lock in that advantage (on a non-refundable basis) for so long as the NLRB proceedings lasted. That turned out to be a long time.

As already pointed out, the Union struck Spentonbush on February 16, 1988. The Union members offered to return to work on September 2, 1988. The charge concerning Spentonbush's refusal to rehire striking employees was filed on January 6, 1989. Hearings before the ALJ were commenced on April 1, 1989. The ALJ issued his decision on March 1, 1994, and the Board issued its decision on December 18, 1995. The case was argued in this Court on December 2, 1996, and this decision is being handed down in February 1997. Over seven years have elapsed since the events at issue and Spentonbush is now being asked to reimburse the strikers and the Union for their intervening financial losses. We believe that the Board's pro-union bent so often displayed in supervisor cases has led to an unconscionable result in the instant case. *See Olivetti Office U.S.A., Inc. v. NLRB,* 926 F.2d 181, 189–90 (2d Cir.), *cert. denied,* 502 U.S. 856, 112 S.Ct. 168, 116 L.Ed.2d 132 (1991); *Emhart Indus. v. NLRB,* 907 F.2d 372, 378–80 (2d Cir.1990).

We reject and set aside those portions of the Board's order that deny Spentonbush captains status as supervisors, find Spentonbush guilty of an unfair labor practice in refusing to reinstate its striking employees and direct restoration of the laws and conditions of the 1985–1988 collective bargaining agreement. In short, we deny enforcement of the Board's order.